878 A.2d 528

**GREENBRIAR CONDOMINIUM, PHASE I COUNCIL OF UNIT OWNERS, INC.**

v.

**Clifford A. BROOKS.**

**No. 126, Sept. Term, 2004.**

Court of Appeals of Maryland.

June 22, 2005.

Reconsideration Denied Aug. 8, 2005.

684

Frank J. Emig (Law Offices of Frank J. Emig, Greenbelt), on brief, for petitioner.

Clifford A. Brooke, Greenbelt, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

CATHELL, J.

This case addresses the foreclosure of liens upon a condominium unit precipitated by more than fifty unpaid condominium assessment installments.[1] In this case, involving an appeal of the second sale at foreclosure, each of which was set aside by the Circuit Court for Prince George's County, we must determine not only the point at which an objector to a foreclosure sale based upon the lien arising from a default in the payment of a condominium fee or assessment must formally make known his objections to the court and to the creditor(s), but also the effect, if any, of a creditor's statement of debt on the debtor's exercise of his right of redemption.

Following the second foreclosure sale which occurred on January 15, 1999, Clifford A. Brooks ("Mr. Brooks"), respondent, filed exceptions to the sale and its audit in the Circuit Court for Prince George's County. Greenbriar Condominium, Phase I, Council of Unit Owners, Inc. ("Council"), petitioner as well as the lien holder and successful foreclosure bidder, sought to enforce the sale so as to collect on the condominium assessment indebtedness based upon numerous defaults in the payment of installments owed by respondent. After the Circuit Court invalidated the sale, petitioner appealed to the Court of Special Appeals which affirmed the lower court's invalidation of the foreclosure sale, but vacated the Circuit Court's award of attorney's fees to respondent, an attorney appearing on his own behalf.

The parties filed cross-petitions for writ of certiorari, and we granted Council's petition, but denied Mr. Brooks' petition,[2] on January 12, 2005. *Greenbriar Condominium, Phase I Council of Unit Owners, Inc. v. Brooks*, 384 Md. 581, 865 A.2d 589 (2005).

---

**1.** The record indicates that there may have been numerous additional subsequent defaults that have been the subject of other litigation.

**2.** At oral argument in May 2005, Mr. Brooks somewhat circuitously attempted to ask for reconsideration of his leave to appeal this Court's January 2005 denial of his petition for writ of certiorari. The Court informed Mr. Brooks that such a request was untimely.

For purposes of clarity, we have restructured the questions presented for our review:

1.  When a debtor makes a tender which the creditor rejects as insufficient, does a creditor's counter with a statement of debt in excess of the debtor's tender prejudice the debtor or constitute a denial of the debtor's right to redeem his property so as to permit a mortgage foreclosure sale to be set aside?

2.  May a mortgage foreclosure sale be set aside because of the lien holder's submission of an incorrect statement of the debt owed even though it is uncontroverted that a default had resulted in a lien in some amount?

3.  At what point must the debtor formally file his objections to the holding of a foreclosure sale?

We hold that prior to the sale, the debtor may seek to enjoin the foreclosure sale from proceeding by filing a motion to enjoin as provided in Maryland Rule 14–209. Should a sale occur, however, the debtor's later filing of exceptions to the sale may challenge only procedural irregularities at the sale or the debtor may challenge the statement of indebtedness by filing exceptions to the auditor's statement of account.[3]

## I.  Facts

It is of no surprise that the series of liens and foreclosure actions in this case that has endured some ten years, has also generated a voluminous record and an extensive set of facts.

We begin with the relevant background in respect to the ownership interest of respondent, Clifford A. Brooks, who in June 1975 purchased for his residential use a condominium[4] in

---

3.  In light of our decision we need not address the Court of Special Appeals' overturning the award of counsel fees to Mr. Brooks. He is no longer the prevailing party.

4.  Mr. Brooks' purchased and apparently, resided in, condominium 304, which was designated in the deed as "Unit numbered 179." We assume that 179 is the unit number as created by the condominium documents and 304 is an address affixed to the unit. While there may be some confusion or discrepancy as to the number of the unit owned

the 253–unit, four phase, Greenbriar Condominium Development and specifically, in Greenbriar Condominium—Phase I located at 7722 Hanover Parkway, Greenbelt, Maryland. As a Greenbriar Condominium—Phase I owner, Mr. Brooks was designated as a member of the "Council of Owners" and, along with all other present and future owners, mortgagees, lessees and occupants, was subject to the by-laws as well as to the provisions of the relevant Declaration of Covenants, Conditions and Restrictions of *both* the Greenbriar Condominium Association ("GCA") and the Greenbriar Condominium, Phase I.[5] The condominium's developer recorded an original Condominium Declaration in November 1974, which was subsequently amended in December 1974. The by-laws were originally recorded in November 1974 and, since that time, have been periodically modified or amended as provided therein. The Phase I by-laws and the declarations are administered by that phase's Board of Directors, Greenbriar Condominium, Phase I Council of Unit Owners, Inc.,[6] and the condominium is managed by its agent, Condominium Venture, Inc., with offices at 7600 Hanover Parkway, Greenbelt, Maryland.

Found within the declarations and by-laws are provisions bestowing authority to levy upon each condominium unit owner an annual assessment payable in monthly installments. In June 1991, Council's Board of Directors adopted a "Policy Resolution" which delineated the procedure for collection of delinquent assessments, stated that a reminder notice which

---

by Mr. Brooks, no issue of this nature has been raised by the parties. Therefore, we do not address it further.

5. Mr. Brooks argued before the Court of Special Appeals that the Phase I by-laws that were in effect at the time he purchased his condominium in 1975, rather than subsequent revisions of the by-laws, should be included among the record of this case. The original Phase I by-laws were included and are relevant insofar as the rate of interest to be applied to the assessment debt, an issue that was addressed by the intermediate appellate court and is referenced *infra,* but this specific interest issue is not before this Court.

6. Council also passes on to GCA, the overall condominium association, some portion of the assessments that it collects from its unit owners that are due to GCA.

included notice of acceleration of the assessments would be mailed on the seventh day of the month and specified that a $15.00 late fee would be imposed on fees not received by the fifteenth day of each month. The Resolution further indicated that a notice of intent to file a lien would be sent to the homeowner if the fee remained unpaid as of the twenty-second day of the month, and a lien would be filed thirty days after service on the owner of the intent to file the lien had been completed.[7]

The monthly assessments appear to have been $254 during the years of 1991 through 1993; the assessment amount was reduced to $239 monthly in 1994 and was further reduced to $229 monthly in 1995 and to $227 for each month of 1996. Apparently, according to amended by-law Article VII, Assessments, Section 3, Acceleration,[8] the assessments may be accelerated as follows:

"Section 3. *Acceleration.* If a unit owner shall be in default in payment of an installment of an assessment, including, but not limited to, the monthly installments based on the annual budget, the Board of Directors may accelerate the remaining installments upon ten (10) days' written notice to such unit owner, whereupon the entire unpaid balance of such installments shall become due upon the date stated in such notice."

---

7. This is fifteen days' more notice than the notice now required in the statute. *See* Md.Code (1974, 2003 Repl.Vol.), § 11–110(e)(3) of the Real Property Article.

8. We believe this provision is found within the most current, but undated, iteration of the by-laws. Council's "Notice[s] of Intent to File Lien" makes reference to the acceleration clause in Article VII of the by-laws. Presumably, this references an intermediate iteration of the by-laws which has not been made available in the record. The various court filings by counsel for Council, however, refer to an acceleration clause in the by-laws, Article IV, Section 14. The Court has not been provided with the precise language of this specific acceleration provision, which was not contained in the original November 1974 by-laws and does not appear in the version we believe to be the most current. The record includes copies of the original November 1974 by-laws and declarations, but only selected excerpts of subsequent by-law revisions.

At least since the late 1980s, Mr. Brooks demonstrated habitual delinquency in making timely payment of each monthly assessment and, in most cases, he was charged a $15.00 late fee for each late payment.

In March 1989 Council recorded among the Land Records for Prince George's County, a Statement of Lien against Mr. Brooks claiming a lien of $3,054.00 in unpaid monthly installments of the annual condominium assessment for the period from December 1, 1988 to December 31, 1989, a period of eleven months of separate installment delinquencies. Upon Mr. Brooks' payment, Council released this lien in February 1990. Similarly, in September of 1992, Council recorded a lien in the amount of $1,524.00 in unpaid assessments and fees for the period from July 1, 1992 through December 31, 1992, a period of six months of delinquencies. Following Mr. Brooks' payment, Council recorded a "Release and Satisfaction of Statement of Lien" on July 8, 1994.

Once again, on April 22, 1994, Council filed a Statement of Condominium Lien among the Land Records of Prince George's County claiming a lien "amount of $2,929.80 for the period from Dec. 1, 1993 to December 31, 1994 [a period of eleven months of delinquencies] plus late fees, interest, collection costs, and attorney's fees" (alteration added).

With the April 22, 1994, lien still unsatisfied as of July 1994, Council's Board of Directors resolved at a July 12, 1994, meeting, to institute foreclosure proceedings upon the lien it had filed in April 1994. Accordingly, on July 20, 1994, Council filed in the Circuit Court for Prince George's County, a "Line to Docket Foreclosure Action." The accompanying Statement of Indebtedness, tallied as of June 30, 1994, indicated the following debt amount:

| | |
|---|---|
| "Actual and accelerated condominium assessment through 12/31/94 | $2,929.80 |
| Late fees through 6/30/94 | 105.00 |
| Collection costs | 155.00 |
| Legal-private process service | 20.00 |

| | |
|---|---:|
| Lien charges | 41.20 |
| Title search | 65.00 |
| Attorney's fees | 75.00 |
| **TOTAL** | **$3,391.00"** |

Council properly noticed Mr. Brooks of its intention to foreclose the condominium lien. The record indicates that Mr. Brooks did not file a response or a petition to enjoin in response to the notice of foreclosure. However, presumably having received payment, the Council recorded a release of this lien on June 8, 1995.

Council thereafter sent to Mr. Brooks another "Notice of Intent to File a Lien" dated January 5, 1995, stating an amount due of $1,577.50, and another notice dated February 23, 1995, stating an amount due of $1,841.50 plus an unspecified amount of attorney's fees.[9] Council subsequently recorded another lien on March 29, 1995, in the amount of $2,748.00 for the period from January 1, 1995 through December 31, 1995, a period of twelve months of delinquencies, and also filed on that same date an Amended Statement of Indebtedness reflecting additional unpaid assessments and fees calculated through March 10, 1995, as follows:

| | |
|---|---:|
| "Actual condominium assessment through 12/31/94 | $  906.00 |
| Actual and accelerated assessments (1/95-12/95 at $229/month) | 2,748.00 |
| Late fees 9/94-3/95 at $15.00/month | 105.00 |
| Collection costs | 105.00 |
| Legal-private process service | 110.00 |
| Lien charges (1995) | 34.00 |
| Attorney's fees | 237.50 |
| **TOTAL** | **$4,245.50"** |

9. Apparently, respondent continued to fail to pay current installments during periods when efforts were being made to collect past defaulted payments.

On April 4, 1995, Council's attorney, Frank J. Emig, and his law partner, Leo Wm. Dunn, Jr., were appointed trustees to conduct a foreclosure sale and they scheduled the foreclosure sale for June 7, 1995. By letter dated April 25, 1995, Council's attorney notified Mr. Brooks of the impending foreclosure sale and advised him that if he paid (no amount was specified) by May 5, 1995, the matter could be resolved without proceeding to the public foreclosure sale. On May 15, 1995, Mr. Brooks hand delivered to the office of Council's attorney a check in the amount of $3,122.50. His accompanying letter stated:

"Transmitted herewith is Riggs Bank cashier's check in the amount of Three Thousand One Hundred twenty-two and 50/100 Dollars ($3,122.50) covering all charges claimed to be due, *excepting only putative accelerated 1995 assessments.* This amount is paid under protest and solely to stop foreclosure proceedings. I continue to dispute the validity and accuracy of the unspecified collection charges added to my account, and again request strict proof and itemization of all such charges or the crediting of my account for all such charges." [Emphasis added.]

That same day, Council accepted Mr. Brooks' check and prorogued the foreclosure sale, but declined to dismiss the case, stating that "if we do not receive each additional monthly installment when it is due on the first of the month, I [Council's attorney] will immediately schedule the property for sale and you will be responsible for all legal costs incurred in this process." [Alteration added.]

On December 5, 1995, Council's attorney advised Mr. Brooks that Council intended to reinstitute the foreclosure proceedings due to Mr. Brooks' failure to pay his October, November, and December 1995 condominium assessments. Council sent Mr. Brooks a "Notice of Intent to File a Lien" dated January 4, 1996, stating a debt of $1,069.00, which included the unpaid assessments, late fees and collection costs.[10] On February 14, 1996, Council recorded another

---

10. These were the same assessments included as accelerated in the statement of indebtedness filed in the foreclosure. Apparently, upon

"Statement of Lien" for $2,724.00, covering the subsequent period from January 1, 1996 to December 1, 1996, another twelve months of separate installment delinquencies. The next day, Council's Board of Directors again resolved to pursue anew the foreclosure proceedings, and on March 8, 1996, Council renewed its previously filed "Line Docket Foreclosure Action," and included an amended statement which detailed Mr. Brooks' indebtedness as of February 20, 1996, as follows:

| | |
|---|---|
| "Actual condominium assessment through 12/31/95 at $22[9]/month[11] | $ 687.00 |
| Actual and accelerated assessments (1/96-12/96 at $227/month) | 2,724.00 |
| Late fees 10/95-2/96 at $15/month | 75.00 |
| Collection costs | 105.00 |
| Legal-private process service | 120.00 |
| Lien charges (1996) | 34.00 |
| TOTAL | $ 3,745.00" |

[Alteration added.]   [Footnote added.]

Council's attorney was again designated as trustee for the purpose of holding the sale and the duly noticed and published (first) foreclosure sale of Mr. Brooks' condominium unit took place on Friday, May 10, 1996, at 9:30 a.m. at the Prince George's County courthouse. Mr. Brooks was not present for the sale and the record is unclear as to whether he had specific notice of the scheduled sale. Council, the sole bidder at the foreclosure sale, purchased the property for $2,500.00, subject to a prior deed of trust of approximately $16,698.26. There is some suggestion in the record that the fair market value of the condominium at the time of the sale was approximately $66,000. On July 3, 1996, Mr. Brooks, pro se, filed

receipt of the partial payment, the proceeding was put on hold pending the prompt payment of these fees when due. When they were not forthcoming when due, Mr. Brooks was notified that the proceedings would recommence.

11. The monthly installments for 1995 were $229 per month.

exceptions to the sale alleging, *inter alia*, that the acceleration of his monthly installments was invalid and that "[t]he sales price at foreclosure was so grossly inadequate as to shock the conscience and/or to raise a presumption of fraud or irregularity." He also explained his personal declining financial situation [12] and alleged several irregularities in the sale including:

"[F]ailure of notice with respect to the 1994, 1995 and 1996 lien accelerations, failure of due authorization by [petitioner's] Board of Directors with respect to the 1994, 1995 and 1996 accelerations, failure to provide requested documents and vital information to which [respondent] as Unit Owner was entitled, unlawful usurpation of the Board's authority by the Management Agent and/or abdication of same by the Board, the imposition of excessive and/or unlawful assessments and other charges underlying this foreclosure sale . . . ." [Alterations added.]

Mr. Brooks requested that the Circuit Court, *inter alia*, set aside the foreclosure sale and that Council pay Mr. Brooks' attorney's fees. Council filed an opposition to Mr. Brooks' exceptions delineating the various liens that it had recorded.

Following an August 16, 1996, hearing, which was continued on October 18, 1996, Mr. Brooks, a licensed Maryland attorney, argued the illegality of the accelerated assessments and urged that the price obtained at the sale was clearly inadequate, to which the Circuit Court replied that it did not find

---

12. Mr. Brooks, a practicing Maryland attorney, offered the following explanation in the factual recitation of his "Memorandum of Grounds and Authorities in Support of Defendant's Exceptions to Sale:"

"[Respondent] has suffered financial set-backs in his business occasioned first by the unexpected loss of a longstanding line of credit when a larger bank merged with [respondent's] bank, followed by the dissolution of a major client, and most recently by the appointment of [respondent's] law partner as an administrative law judge. As a result, [respondent] periodically fell behind in his regular monthly payment of condo fees, but would bring himself current. As a long term owner, resident and former Board [of Directors of the Council of Unit Owners] member, [respondent] has never had any intent, purpose or desire not to pay lawful monthly assessments to the Council of Unit Owners of which he has been a member for twenty-one (21) years." [Alterations added.]

the price shocking given potential bidders' disinclination to become embroiled in the disputes with condominium boards that typically accompany a condominium foreclosure. Mr. Brooks did not introduce any evidence of the value of the condominium unit at trial. The Circuit Court overruled the exceptions and ratified the foreclosure sale by order dated October 23, 1996. Mr. Brooks thereafter noted an appeal to the Court of Special Appeals. No audit of the foreclosure sale took place pending that appeal.

On October 31, 1996, Council filed a Motion for Judgment of Possession, and a Show Cause hearing was scheduled for March 7, 1997. Mr. Brooks countered with opposition to Council's motion as well as his own motion seeking to stay, without bond, the judgment of ratification pending the outcome of his appeal to the intermediate appellate court. In the time leading to the Show Cause hearing, Mr. Brooks continued to occupy the property, but had not paid the holder of the first deed of trust since June 1996, and had not paid the condominium assessments since October 1995. At the Show Cause hearing, the Circuit Court ordered the payment within one week of a *supersedeas* bond in the amount of $12,500.00 in order to stay execution of the sale's ratification. On March 14, 1997, as ordered, Mr. Brooks paid into the registry of the Circuit Court a *supersedeas* bond in the amount of $12,500.00.

In an unreported opinion, the Court of Special Appeals vacated the Circuit Court's ratification of the sale and by mandate issued February 18, 1998, remanded the matter, stating that further evidence was needed to determine if the difference between the foreclosure sale price and the appraised value less the mortgage "shocks the conscience." [13] Furthermore, the intermediate appellate court both declined to address the legality of the acceleration of the condominium assessments, noting that the trial court had not addressed the

---

13. This was not a decision intimating that the Court of Special Appeals believed that the price "shocked the conscience" of that court, only that more evidence on the issue was needed. Many factors tend to drive down the price of such sales based upon condominium assessment defaults.

issue, and did not reach the issue of validity of the liens filed by Council because Mr. Brooks had not contested, either prior to the liens' filings and/or prior to the foreclosure sale, the propriety of the liens. Accordingly, the issues on remand were limited to "the appraised value of the condominium unit, the mortgage remaining on [respondent's] unit, the sale price, and any deficiency [respondent] is willing to forego." *Clifford A. Brooks v. Greenbriar Condominium, Phase I, Council of Unit Owners, Inc.,* No. 87–1997, slip op. at 18 (Md.App. December 17, 1997) (alterations added). A petition for writ of certiorari to the Court of Appeals ultimately was denied on May 13, 1998. *Greenbriar Condominium, Phase I, Council of Unit Owners, Inc., v. Brooks,* 349 Md. 496, 709 A.2d 140 (1998).

On the same date as the mandate issued by the Court of Special Appeals, Mr. Brooks filed an emergency motion to have released to him the funds in the Circuit Court's registry. His motion stated, "Time is of the essence, because a superior lien holder has scheduled the subject property for foreclosure on February 26, 1998, and the released funds will be required to forestall said prospective foreclosure." Mr. Brooks did not name the priority lien holder, but the Court presumes that it was the holder of the first deed of trust, which at that time, apparently, was in arrears. Council opposed this motion and sought to collect the monthly condominium assessments from November 1, 1996 through June 1, 1998, that Mr. Brooks had failed to pay following the ratification of the foreclosure sale. The motion's hearing was adjourned pending the scheduled August 28, 1998, hearing on the matters remanded by the Court of Special Appeals.

At the hearing, at which the parties offered testimony, including that of Mr. Brooks, as to the value of the condominium unit, on September 3, 1998, the Circuit Court accepted an appraiser's figure of $67,000 as the condominium unit's value as of the May 1996 foreclosure sale. Thereafter, Council filed with the auditor, Andrew W. Dyer, a "Suggested Final Accounting" which appeared as follows:

"Sale Price less:                                                              $  2,500.00

| | |
|---|---|
| Balance due under Amended Statement of Indebtedness as of 2/20/96 (filed on March 8, 1996) | 3,745.00 |
| Interest at 1-1/2% [i.e., 18% per annum] per month on assessments of $687.00 for 1995 lien and $2,724.00 for 1996 lien from 2/20/96-8/20/98 (30 months). | 1,534.95 |
| Late charges, 3/96-12/96 at $15.00 per month | 150.00 |
| Management agent—preparation for and appearance at Exceptions hearing . . . . | 412.50 |
| Attorneys' fees and foreclosure costs incurred in enforcing 1995 and 1996 condominium liens. . . . [P]ublication costs of $272.00 and $45.00, auctioneer fee of $75.00, and title search of $65.00 . . . . | 19,464.75 |
| Auditor's fee. | 250.00 |
| **DEFICIENCY** | **$23,057.20**" |

[Alteration added.]

The auditor filed an audit statement allowing a total of $22,208.21 (comprised of the $2,500 sale price plus a $19,708.21 deficiency) which the Circuit Court ratified on September 21, 1998. That same day, Mr. Brooks filed exceptions to the audit, including among the exceptions his request that the attorney's fees and costs related to defending the sale or subsequently alienating the unit as well as the post-foreclosure sale late fees be excluded from the accounting. He further sought to have his percentage interest in the condominium's common elements included as a set-off or a deduction. The Circuit Court declined to order the auditor to modify his account. Nevertheless, on October 1, 1998, Mr. Brooks supplemented his exceptions to the auditor's account and filed a "Suggested Account" as follows:

| | | |
|---|---|---|
| "Proceeds of Sale | | $  2,500.00 |
| TO: Assessment Debt | $  3,411.00 | |
| Adjustment of Taxes prepaid 9/25/95 & 3/19/96 for 5/10/96 to 6/30/96 | (      169.40) * | |
| Adjustment of Taxes paid by [Mr. Brooks] since the date of sale | (  3,473.76) * | |
| Adjustment—Late Fee overcharge (5/95) | (      15.00) | |

| | | |
|---|---|---|
| Paid to Superior Lienholder since date of sale | (16,580.81) * | |
| Interest from 3/7/97 to 7/31/98 on $12,500.00 Cash Bond | ( 3,143.84) | |
| SURPLUS TO [Mr. Brooks] | | (22,471.81) * |
| TOTAL | (19,971.81) | (19,971.81) |

* Also, any additional payments required to be made by [Mr. Brooks] to the first trust holder prior to [the Council's] payoff of said first trust." [Alterations added.]

A hearing on the exceptions to the auditor's report took place on November 4, 1998, at which the Circuit Court ordered the auditor to restate his account as if no exceptions had been taken subsequent to the sale and stated that it would examine the revised figures to determine if they shocked the court's conscience. The auditor's amended account, which was ratified on November 23, 1998, called for a total of $5,445.89, comprised of the $2,500 in sale proceeds plus a deficiency of $2,773.17. On the same day as the hearing, Mr. Brooks filed a motion to recover expenses and attorney's fees in the amount of $49,127.29, for the period of June 11, 1998 through October 23, 1998, which were incurred in making proof of the fair market value of his condominium. Council opposed this motion alleging that Mr. Brooks need only have hired an appraiser to establish the condominium's value and stating that the motion "is a bogus and transparent attempt to wrongfully extract compensation for which he is not entitled." At the December 8, 1998 hearing on the exceptions, the Circuit Court found its "conscience to be shocked" by the sales price and set aside the May 10, 1996, foreclosure sale, but directed that the "mortgagee [sic] is free to readvertise and [resell]" the property (alterations added). Two days later, on December 10th, Mr. Brooks hand-delivered a check for $3,411.00 [14] to the office of Council's attorney, stating in his accompanying letter that

14. This figure is comprised of three months of 1995 condominium assessments at $229 per month plus twelve months of 1996 condominium assessments at $227 per month, i.e., ($229 × 3) + ($227 × 12) = $3,411.00. These unpaid assessments were listed in Council's March 8, 1996, filing which provided an amended statement of debt tallied as of February 20, 1996.

the check was "in full payment of the underlying 1995–1996 liens." Council returned the check the next day, December 11th, stating that the amount tendered was "insufficient to fully pay the 1995–1996 liens." A second foreclosure on the condominium unit was scheduled for January 15, 1999 at 9:30 a.m. at the Prince George's County Courthouse.

By letter dated December 21, 1998, Mr. Brooks acknowledged Council's rejection of his check for $3,411.00, and requested to be advised in writing of the specific charges and their basis in excess of the $3,411.00, that Council claimed were due on the liens. On December 29, 1998, Council filed a "Supplemental Statement of Indebtedness as of December 20, 1998" as follows:

| | |
|---|---:|
| "Amount stated on Amended Statement of Indebtedness (as of 2/20/96) filed in these proceedings | $ 3,745.00 |
| Late fees 3/96-12/96 at $15/month | 150.00 |
| Interest on 1995 lien of $687.00 at 1-1/2% per month from 1/1/96 to 12/20/98 based upon By-Laws and statute | 367.37 |
| Interest on 1996 lien of $2,724.00 at 1-1/2% per month from 1/1/97 to 12/20/98 based upon By-Laws and statute | 967.02 |
| Court costs | 90.00 |
| Auditor's fee | 250.00 |
| Advertising costs | 317.00 |
| Bond premium | 75.00 |
| Title examination | 65.00 |
| Auctioneer's fee | 75.00 |
| Attorneys' fees re lien foreclosure | 1,050.00 |
| Attorneys' fees/costs re Exceptions and possession | 5,566.80 |
| Attorneys' fees/costs re Appeal and remand proceedings in Circuit Court | 18,396.45 |
| TOTAL | $31,114.64" |

Upon receipt of Council's Supplemental Statement of Indebtedness, which included notice of the scheduled January 15, 1999, foreclosure sale, Mr. Brooks was advised of the specific debt claimed by Council.

Mr. Brooks made no court filings in this case between January 1, 1999, and January 15, 1999. The (second) foreclo-

sure sale took place on Friday, January 15, 1999, at 9:30 a.m., the scheduled time for the sale. Once again, Council was the sole and successful bidder, having bid the sum of $21,600.00, subject to a prior Deed of Trust in the approximate amount of $13,092.77. Shortly after the sale was held, Mr. Brooks filed an "Emergency Motion for Temporary Restraining Order and for Preliminary Injunction," attempting to enjoin the already-held sale.[15] Mr. Brooks filed another post-sale "Emergency Motion for Appropriate Relief" on Monday, January 19, 1999, in which he sought to stay further proceedings in respect to the January 15th foreclosure sale. He explained in this motion that he had intended to reach the courthouse at 8:45 a.m. on January 15th in order to enjoin the sale. He stated:

"On Thursday, January 14, 1999, Mr. Brooks[16] made arrangements with the Court to hear at 8:45 a.m. on Friday, January 15, 1999, his motion to restrain and enjoin [Council's] proposed 9:30 a.m. sale of even date. On the afternoon of January 14, 1999, Mr. Brooks advised Mr. Emig that said hearing had been set.[17] However, as a result of the ice storm which occurred on January 14th and 15th (resulting in power outages and school closings both days), Mr. Brooks suffered electrical power 'brown outs' that caused the loss of both the proposed orders and extensive corrections to said motion which had been entered into Mr. Brooks' word processor. Because of the time required to re-enter into the word processor said orders and corrections and to safely

---

15. In conjunction with this filing, Mr. Brooks endeavored to file in the court's registry his December 10, 1998, check for $3,411.00. The clerk declined to accept the check because its payee was indicated as "Greenbriar Condominium—Phase I, Council of Unit Owners, Inc." rather than "Clerk of the Court." Following instructions from the judge, however, the check was rewritten, and the clerk accepted the check.

16. Mr. Brooks often refers to himself in the third person in his pleadings.

17. Mr. Emig apparently arrived at the Judge's chambers at 8:45 a.m. He waited until approximately 9:30 a.m. at which time he departed for the foreclosure sale.

reach the courthouse under the perilous weather related driving conditions, Mr. Brooks was unable to reach the courthouse until 9:45 a.m. In route to the courthouse, however, Mr. Brooks telephoned Judge Hotten's secretary and advised her of his situation and asked for additional time to get to the courthouse. She advised Mr. Brooks that Mr. Emig had been in chambers but had left saying that he had to file a bond.[18] After briefly putting Mr. Brooks on hold, Judge Hotten's secretary advised Mr. Brooks that Judge Hotten had directed her to go downstairs to instruct Trustee Emig not to conduct the sale and to return to chambers until Mr. Brooks' said motion could be heard upon his arrival. Upon Mr. Brooks' arrival at Judge Hotten's chambers, Judge Hotten's secretary advised Mr. Brooks that when she arrived downstairs to the front of the courthouse at 9:32 a.m., a 'white haired' man told her that the sale had taken place at 9:31 a.m. Upon his arrival, Mr. Brooks saw Mr. Emig with several other people leaving the courthouse parking lot." [Alterations added.] [Footnotes added.]

Council filed an opposition to Mr. Brooks' emergency motions asserting that the request for injunctive relief was moot, the sale was properly held and Mr. Brooks would be occasioned no harm by the filing of the trustee's Report of Sale, Affidavit of Purchaser and other post-sale documents. At a hearing on the emergency motions on January 28, 1999, the Circuit Court ordered both parties to submit a suggested statement of account, and instructed that once submitted, the auditor would state the account and the parties may take exceptions therefrom.

The Council filed its "Suggested Final Accounting" on March 5, 1999, as follows:

"1. Sale Price-$21,600

2. Debt and Expenses:

---

**18.** Mr. Emig secured a bond, dated December 31, 1998, in the amount of $32,000.

| | |
|---|---:|
| a. Amount due [Council] as of 5/10/96 .... | $    5,445.00 |
| b. Late charges on 1996 lien at $15 per month from 6/96-12/96 (7 months) | 105.00 |
| c. Interest on 1995 lien of $687 from 1/1/96-3/1/99 | 391.59 |
| d. Interest on 1996 lien of $2,724 from 2/20/96-2/20/99 | 1,470.96 |
| e. Attorneys fees 12/17/98-2/24/99 .... [Frank Emig] | 1,925.00 |
| f. Enquirer Gazette .... | 340.17 |
| g. Enquirer Gazette—notice | 60.00 |
| h. Atlantic Bonding Company .... | 128.00 |
| i. Auctioneer (Wm.Smart) .... | 100.00 |
| j. Trustee commission—Frank Emig | 1,230.00 |
| k. Auditor's fee (estimated) | 250.00 |
| TOTAL EXPENSES | $11,445.[7]2" |

[Alteration added.]

The Circuit Court signed an order on March 25, 1999, noticing that the foreclosure sale would be ratified on April 26, 1999, and directing that any exceptions be filed by that date. Mr. Brooks filed exceptions on April 26, 1999, asserting as follows:

"Said resale should be set aside, because, *inter alia:* (1) [Council] and Trustee Emig fraudulently deprived [Mr. Brooks] of his right of redemption by demanding excessive and unlawful payments as a condition of redemption; (2) [Council] and Trustee Emig fraudulently deprived [Mr. Brooks] of his right of redemption by failing, prior to initiating foreclosure proceedings, to demand of [Mr. Brooks] a lawful payment necessary for him to exercise his right of redemption; this despite specific request from [Mr. Brooks] for such demand; (3) Trustee Emig breached his fiduciary duty to [Mr. Brooks] and to the Court by his blatant acts of gamesmanship to the consistent detriment of [Mr. Brooks] and short term benefit of [Council] (Trustee Emig's client at law), and by his conflicting roles and loyalties as both trustee for the protection of all with

equitable rights (including [Mr. Brooks]) and as counsel to [Council] and to its Managing Agent; (4) the sale was not fairly conducted in that: (a) the advertisement required excessive interest (16%) on sale price in light of current market interest; (b) the resale was premature and based upon unlawful demands; (c) the sale was not well attended; and (d) the sale price was preset by Trustee with an eye toward establishing the minimum amount Trustee believed necessary to avoid the fate of the first sale, and not toward 'a view to obtain as large a price as might, with due diligence and attention, be fairly and reasonably obtainable under the circumstances'; (5) the sale price at foreclosure is so grossly inadequate as to shock the conscience; (6) the sale price is grossly inadequate and when combined with irregularities in the original sale and in the resale constitutes a constructively fraudulent sale; (7) the resale was premature in that the provisions of Maryland Rule 14–205 were not complied with prior to the resale; (8) the instant resale is precluded by the equitable considerations underlying Maryland Rule 14–205 (to wit: that after hearing the Court 'fix the amount of the debt', and 'provide a reasonable time within which payment may be made' before resale); (9) the resale was not duly authorized by the Greenbriar Board of Directors; and (10) [Council] lacks clean hands." [Alterations added.]

Mr. Brooks filed an opposition to Council's suggested accounting on May 12, 1999, and included his own suggested account for the foreclosure resale:

| "Proceeds of Sale | | $21,600.00 |
|---|---|---|
| Adjustment of Taxes (FY '99 1/15/99 to 6/30/99[)] | | $ 487.27 |
| TO: Assessment debt | $ 1,388.50 | |
|    Late Charge (3/96 to 5/10/96 sale) | $ 30.00 | |
| Surplus to [Mr. Brooks] | | (20,668.77) |
| TOTAL | $ 1,418.50 | $ 1,418.50" |

[Footnote omitted.]

Mr. Brooks included a notation with his suggested accounting that indicated his belief that:

"[The Circuit Court's] requested account is rather to establish the amount properly due for redemption purposes on the 1995–1996 liens at the time of the ineffectual May 10, 1996, sale. Thus, the account proposed hereinabove and the account proposed [by Council], are each premature. [Mr. Brooks] reserves all rights with respect to the final accounting for the January 15, 1999 resale, should such an accounting become necessary as a result of the Court's subsequent ratification of said resale." [Alterations added.]

Respondent, then, however, went on to provide a second "Suggested Accounting" which, somewhat inexplicably,[19] applied the sale price from the May 1996 foreclosure sale, which had been set aside:

| | | |
|---|---:|---:|
| "Proceeds of Sale | | $ 2,500.00 |
| Adjustment of Taxes (FY '96 $1212.38 @ 52 Days[]) ] | | $ 172.72 |
| TO: Assessment debt | $ 1,388.50 | |
| Late Charge (3/96 to 5/10/96 sale) | $ 30.00 | |
| Surplus to [Mr. Brooks] | | ( 1,254.22) |
| TOTAL | $ 1,418.50 | $ 1,418.50" |

[Footnote omitted.]

The auditor filed his report on May 14, 1999, as follows:

| | |
|---|---:|
| "Proceeds of Sale | 21,600.00 |
| Interest | |
| Adjustment of Taxes | 487.27 |
| TO: | |
| Court Costs | 90.00 |

19. Mr. Brooks endeavored to explain the result of his second suggested accounting as follows:

"The total amount due under the 1995–1996 liens for purposes of [Mr. Brooks'] exercise of his right of redemption is not more than $1,418.50. However, said amount is subject to 100% + set-off or credit based, *inter alia,* upon the Court's ruling on [Mr. Brooks'] pending Maryland Rule 2–424(e) [Admission of facts and genuineness of documents] motion. . . . [Mr. Brooks] reserves all rights." [Alterations added.]

| | | |
|---|---|---|
| Auditor's Fee | 250.00 | |
| Advertising Costs | 400.17 | |
| Bond Premium | 128.00 | |
| Examiner's Fee | 65.00 | |
| Auctioneer's Fee | 100.00 | |
| Trustee's Commission (Rule) | 1,230.00 | |
| Attorney's Fee (Sale) | 1,150.00 | |
| Attorney's Fee (Preliminary Injunction) | 775.00 | |
| Attorney's Fee (Exceptions) | 437.50 | |
| Assessment Debt | 3,411.00 | |
| Interest from 2/20/96 to 1/15/99 * | 593.79 | |
| Late Charge | 30.00 | |
| Escrow Deficit/(Credit) | | |
| (SURPLUS) ** | | (13,426.81) |
| TOTAL | 8,660.46 | 8,660.46 |

* Interest payable at 6% per Section 9 of Declaration of Covenants
**Surplus payable to owner or his successors in interest or to junior lien claims filed. [No junior liens were filed.]" [Alteration added.]

Both Council and Mr. Brooks filed timely exceptions to the auditor's report. Following the scheduled May 27, 1999, hearing on the exceptions to the sale, the Circuit Court stated that it would address only "whether or not the [second] sale was conducted properly and a reasonable price paid . . ." and ultimately, sustained the exceptions and apparently overturned the foreclosure sale. The Circuit Court noted that "[t]he [second] sale is based upon the original amount due that gave rise to the [first] sale. We are going back to that point, not what transpired beyond that point (alterations added)." Council argued that the indebtedness was, at a minimum, the figure of $5,445.89 stated in the auditor's revised report and even if Mr. Brooks believed that the $3,411.00 payment that he had tendered to Council and later deposited in the Circuit Court's registry was all that was owed once the first foreclosure sale had been set aside, his proper remedy prior to the second foreclosure sale was to file a motion for an injunction. Council's attorney asserted that "[f]ull payment of the liens is full payment of everything." Council argued that it was entitled, at a minimum, to collect interest on the assessment debt (*i.e.,* the 1995 and the 1996 liens) at least through the date of the liens' payment, just as it would be entitled to

collect interest on the debt up to and including the date of a foreclosure sale. Mr. Brooks maintained that the set aside of the first foreclosure sale restored his right to redeem the property, and his deposit of $3,411.00 into the court's registry in satisfaction of the condominium assessment debt for 1995 and 1996 was a good faith effort to exercise that right. He argued that Council aimed to thwart his right of redemption with the December 1998 submission of the Supplemental Statement of Indebtedness in the amount of $31,114.64. The Circuit Court determined that upon receipt of Mr. Brooks' earlier-calculated $162.89 in interest coupled with delivery to Council of the $3,411.00 already in the Circuit Court's registry, it would dismiss the foreclosure action. A later colloquy (at a July 6th hearing) summarized the Circuit Court's conclusion:

"MR. EMIG: Well, the problem that I had was the [$]3,411 was what was owed when the lien was filed in '96, and since that time interest accrued on that [ ] assessment for the following year.

THE COURT: Mr. Emig, when you have a lien, you have a lien, and that is the lien that was there.

Now, when that was offered and you refused it, and that is the lien that is in the court, then I have a problem. Something else may come later, but that is the lien that is in the court.

MR. EMIG: I understand that.

THE COURT: And as I understand it, that was tendered and that was refused....

MR. EMIG: The only thing that was tendered was the lien, *but not the accrued interest on the lien.*

THE COURT: You are talking about something later. But the lien, whatever the lien was, as I understand it, that was tendered to you, and you refused, and that is the lien that is in the court.

Now, correct me if I am wrong, that is the lien that we were dealing with as of that time it was tendered, a check was offered, and it was refused.

MR. EMIG: *I disagree with the court to this extent, that what was tendered in December of '98 was only the basic lien. It did not include the statutory interest that we were entitled to.*

THE COURT: It included the lien that was in this court that gave rise to all of this. There may be something that could come later as interest that would be due, but the lien that was on file in the court that he failed to deny, and therefore, it became this, that the lien that I understood at that time to have been offered...." [Alterations added.] [Emphasis added.]

The Circuit Court then advised that Council was free to file a new lien for other outstanding debt amounts and pursue another foreclosure sale.

Mr. Brooks filed a motion for attorney's fees and costs on June 4, 1999 pursuant to a provision in the November 11, 1974, Declarations.[20] By letter dated June 15, 1999, Council

---

**20.** The language on which Mr. Brooks presumably relies is found in two locations and states as follows:

*"ARTICLE XII*
*RELIEF IN CASE OF DEFAULT*

Each Owner shall be governed by, and shall comply with, all of the terms of this Declaration and any amendments hereto. A default by an Owner under this Agreement shall entitle each of the other Owners to the following relief:

. . .

(c) In any proceeding arising out of any alleged default by an Owner, the prevailing party shall be entitled to recover the costs of the proceedings, and such reasonable attorneys' fees as may be determined by the court."

*See also,*
"[ORIGINAL] BYLAWS OF THE GREENBRIAR CONDOMINIUM– PHASE I

*ARTICLE XI*

*Compliance and Default*

Section 1. *Relief....*

. . .

(c) *Costs and Attorneys' Fees.* In any proceeding arising out of an alleged default by an Owner, the prevailing party shall be entitled to

rejected Mr. Brooks' tender of $74.30,[21] which was intended to accompany the $3,411.00 already in the Circuit Court's registry. Council filed opposition on June 17, 1999, to Mr. Brooks' motion for fees and also filed an amended set of exceptions to the auditor's report as well as a motion to reconsider, seeking review of the Circuit Court's May 27th statement of its intent to dismiss the foreclosure action. At a July 6, 1999, hearing, the Circuit Court considered Mr. Brooks' motion for attorney's fees and Council's motion for reconsideration. Council argued that Mr. Brooks' invocation of the Declarations in support of his motion for attorney's fees was misplaced because the attorney's fees provision he cited was contained in the Greenbriar Condominium Association's Declaration, and it was Greenbriar Condominium, Phase I Council of Unit Owners, Inc. which initiated suit against Mr. Brooks.[22] Council further argued that the rate of interest to be applied to outstanding assessments was incorrectly stated at six percent.[23]

---

recover the costs of the proceeding, and such reasonable attorneys' fees as may be determined by the court." [Alteration added.]

The foreclosure proceeding arose from Mr. Brooks' failure to pay his monthly condominium assessment. Thus, it is curious that he seeks to recover attorney's fees arising from an action that he, an owner, precipitated.

21. Apparently, Mr. Brooks had again recalculated the amount of interest he believed was owed on the 1995 and 1996 lien debts. He made some reference to this amount at the May 27, 1999, hearing, but offered no insight as to how he arrived at such a figure. He later explained that $74.30 includes interest on $3,411.00 at six percent (the rate found in the Greenbriar Condominium Association Declarations document) calculated through May 10, 1996, for a total of $44.30, plus two months' late fee, or $30.00.

22. We note that Mr. Brooks' citation of the attorney's fees provision is found on page 34 of the document entitled, "Declaration of Covenants, Conditions and Restrictions." The document begins, "THIS DECLARATION is made and executed this 11th day of November, 1974, by GREENBRIAR ASSOCIATES, a Maryland limited partnership (hereinafter referred to as the 'Developer')." We have, however, already questioned the application of this provision. *See supra.*

23. Apparently, counsel was referring to a Declaration found in the record entitled, "Declaration Establishing a Plan for Condominium

Ownership of Premises Located in Prince George's County, Maryland Pursuant to the Horizontal Property Act of the State of Maryland," which states at Section 3, *"Name of Condominium. This Condominium shall be known as 'Greenbriar Condominium—Phase I.' " This set of Declarations is silent as to the interest to be applied to unpaid assessments. In fact, this set of Declarations, dated November 11, 1974, is silent as to the topic of assessments generally.*

According to Md.Code (1974, 2003 Repl.Vol.), § 11–110 of the Real Property Article:

"**§ 11–110. Common expenses and profits; assessments; liens.**
. . .

(e) *Interest on unpaid assessment; late charges; demand for payment of remaining annual assessment.*—(1) Any assessment, or installment thereof, not paid when due shall bear interest, at the option of the council of unit owners, from the date when due until paid at the rate provided in the bylaws, not exceeding 18 percent per annum, and if no rate is provided, then at 18 percent per annum."

Council's attorney argued that, because of the GCA Declaration's silence, the by-laws for Phase I would govern. The by-laws, originally recorded in 1974, however, provided as follows:

"BYLAWS OF THE GREENBRIAR CONDOMINIUM–PHASE I
*ARTICLE XI*

*Compliance and Default*

Section 1. *Relief. . . .*
. . .

(e) *Interest.* In the event of a dafault [sic] by any Owner in paying any Common Expenses or other sum assessed against him which continues for a period in excess of fifteen (15) days, such Owner shall be obligated to pay interest on the amounts due at the rate of eight percent (8%) per annum from the due date thereof."

The Court has been provided with excerpts of by-laws that apparently were amended, at some unspecified date, which altered, *inter alia,* the rate of interest applied to unpaid assessments. The relevant revision is as follows:

"BY-LAWS OF
GREENBRIAR CONDOMINIUM—PHASE I
COUNCIL OF UNIT OWNERS
. . .

ARTICLE VII
*Assessments*
. . .

Section 2. *Creation of the Lien and Personal Obligation for Assessments.*

(a) Each owner of any unit, by acceptance of a deed therefor, whether or not it shall be so expressed in such deed, is deemed to covenant and agree to pay to the Council: (1) annual assessments or charges. . . . All such assessments, together with management charges, interest, costs, and reasonable attorney's fees, in the maximum amount permitted by law, and the maximum late charge as

Mr. Brooks asserted that his deed is subject solely to the GCA Declaration, and moreover, although the GCA does not collect any funds directly, it still receives funds channeled through the Phase I Council of Unit Owners. The funds are collected by the petitioner, Greenbriar Condominium, Phase I Council of Unit Owners, Inc. which, in turn, makes payments to the GCA. In awarding attorney's fees to Mr. Brooks, the Circuit Court observed that all four phases of the Greenbriar development pay fees to the GCA and stated that if the Declaration of the GCA:

"[S]ays that it grants attorney fees when the other side prevails, and the other side prevails in a suit brought about by the parent organization, which collects for that organization, for those funds, and then you are going to tell me that the other side, for that portion of the funds, can't elect to have attorney fees granted, somehow or other, that doesn't make any sense." [Alteration added.]

The Circuit Court denied Council's motion to reconsider and also denied Mr. Brooks' motion to award fees in respect to the November 1998 determination of the value of the condominium. The Circuit Court determined that it would sign two orders: one, an order prepared by Mr. Emig, releasing to Council the money in the registry of the court, and the next day, the Circuit Court signed an order directing that the Clerk of the Court make payment from its registry to Council in the

---

permitted by Section 11–110(e) of the [Condominium] Act, shall be a charge on the unit and shall be a continuing lien upon the unit against which each such assessment is made...."

It can be presumed that Mr. Brooks based his six percent interest figure on the provision found in another Declaration, entitled, "Declaration of Covenants, Conditions and Restrictions," which was also executed on November 11, 1974, and provides in relevant part:

*"Article IV, Covenant for Maintenance Assessments*

. . .

*Section 9. Effect of Non–Payment of Assessment. The Personal Obligation of the Owner: The Lien; Remedies of Association....* "If the assessment is not paid within thirty (30) days after the delinquency date, the assessment shall bear interest from the date of delinquency at the rate of six percent (6%) per annum...."

The Council argued that this provision applied only to the GCA, *i.e.,* the "Association."

amount of $3,411.00.[24] Mr. Brooks was instructed to submit to the judge a statement of his attorney's fees. The second order was to be a joint order reflecting the Circuit Court's July 6th rulings and resulting in dismissal of Council's complaint. The parties were unable to agree on the language of a joint order, and as a result, each party submitted a proposed order. The Circuit Court did not sign either order at that time.

On July 21, 1999, Council filed a "Motion for Supersedeas Bond and to Stay Further Proceedings." The motion indicated Council's intention to appeal both the Circuit Court's forthcoming dismissal and its award of attorney's fees and sought to prevent Mr. Brooks from disposing or otherwise encumbering the property in the meantime. Mr. Brooks filed an opposition.

By motion dated January 2, 2000, Mr. Brooks sought attorney's fees and costs in the amount of $311,305.64. Council disputed Mr. Brooks' claimed fees and, notwithstanding its pending motion for stay, asserted that respondent's motion was premature until such time as the Circuit Court signed an order affirming its July 6, 1999, dismissal of Council's complaint and memorializing its award of attorney's fees. Some two years later, on September 23, 2002, the Circuit Court finally filed an order that read as follow:

"For the reasons stated by the Court at the July 6, 1999 hearing in this matter, it is, on this 23 day of September, 2002, by the Circuit Court for Prince George's County, Maryland,

---

24. The clerk twice issued the ordered check to the attention of Mr. Emig: once following the Circuit Court's order in July of 1999, and again on February 8, 2001, upon receipt of Mr. Emig's February 6, 2001, letter which stated that "[t]he attached check was not timely deposited and is now stale. Would you please reissue a check for the same amount and return to my office?"

The clerk sent a notice to Mr. Emig dated May 13, 2004, noting that the check had not been cashed. Mr. Emig replied that, indeed, he had not cashed the check, he was not in need of a replacement check, and stated, "case is on appeal. I will cash the check when case is over."

ORDERED, that [Council's] Complaint in these proceedings is hereby dismissed and the foreclosure sale of January 15, 1999, invalidated; and it is further,

ORDERED, that [Council's] Motion to Reconsider Ruling of May 27, 1999, is hereby denied; and it is further,

ORDERED, that [Brooks'] Motion, pursuant to Md. Rule 2–424(e), to recover expenses, including reasonable attorney fees incurred in making proof of matter which [Council] failed to admit (Docket # 98) is hereby denied; and it is further,

ORDERED, that [Council] shall pay to [Brooks] reasonable attorney's fees for his prior appeal to the Court of Special Appeals in these proceedings, such amount to be determined following a hearing on this issue; and it is further,

ORDERED, that [Brooks] shall establish his reasonable attorney fees for his involvement in these proceedings after December 17, 1997. The parties shall also establish the percent of the budget of [Council] that is paid to [GCA] for its assessments. [Council] shall be responsible for and pay to [Brooks] this percentage of [Brooks'] attorney's fees for his involvement in these proceedings after December 17, 1997. The determination of these figures shall be made by the Court following a hearing on this issue; and it is further,

ORDERED, that the issue of the amount of attorneys' fees shall be deferred until the completion of any appeal of this Order; and it is further,

ORDERED, that the amount of the *supersedeas* bond is hereby set at $1,000.00. [Council] shall be given seven (7) days to post such bond and the effect of this Order shall be stayed during this seven (7) day period, and if such bond is timely posted, the stay shall continue in effect thereafter until the appeal is completed." [Alterations added.]

On September 30, 2002, the Circuit Court granted Council's motion to allow a cash bond in lieu of a *supersedeas* bond.

Council noted an appeal to the Court of Special Appeals [25] on October 16, 2002, appealing the Circuit Court's September 23, 2002, order that invalidated the second foreclosure sale and awarded Mr. Brooks attorney's fees; Mr. Brooks cross-appealed on October 25, 2002.

Each party presented questions to the intermediate appellate court. Council sought review of the following:

"1. Did the circuit court err in setting aside the January 15, 1999 foreclosure sale of Brooks's property?

2. Did the circuit court err in determining that Brooks was entitled to an award of attorneys' fees?"

Mr. Brooks presented three questions which the Court of Special Appeals slightly rephrased:

"1. Did the circuit court err in its assessment of the amount due for 1995 and 1996 liens by failing to take into account all payments made by Brooks?

2. Did the circuit court err in finding that Brooks was not entitled to attorneys' fees for records and amounts excluded by the court?

3. Did the circuit court err in not granting reasonable attorneys' fees to Brooks under Maryland Rule 2–424(e)? Brooks also moved to dismiss the case, claiming that the Council's Notice of Appeal was not timely filed."

*Greenbriar Condominium, Phase I, Council of Unit Owners, Inc. v. Brooks,* 159 Md.App. 275, 282, 859 A.2d 239, 243 (2004).

As to Council's questions, the Court of Special Appeals affirmed the Circuit Court's invalidation of the January 15, 1999, foreclosure sale, holding:

---

**25.** The Court of Special Appeals had already entertained a second consolidated appeal between the parties in respect to Mr. Brooks' unpaid condominium assessments for the period of January 1, 1997 through May 31, 2001, and had issued an unreported decision. *Brooks v. Greenbriar Condominium Phase I, Council of Unit[ ] Owners and Condominium Venture, Inc.,* Nos. 1858 and 2464, September Term, 2001 (filed November 24, 2003).

These fifty-three separate defaults—January 1, 1997 thru May 31, 2001—are apparently in addition to the fifty-plus delinquencies at issue in this case.

"The circuit court was not clearly erroneous in its determination that Brooks had attempted a good faith tender when he submitted to Council $3,411 and, when the tender was refused, sought clarification from Council on the amount due. Council's refusal letter indicated that Council was unwilling to accept any amount less than $31,114.64, which included attorneys' fees for the prior invalid foreclosure proceeding. This was sufficient to support a finding that tendering the additional $162.89, which Brooks had calculated was due since the last sale, would be a futile gesture."

*Id.* at 302, 859 A.2d at 254. The intermediate appellate court, however, vacated the Circuit Court's award of attorney's fees, observing that Mr. Brooks was not actually the "prevailing party," in that "[i]t was only during the enforcement proceedings that Brooks cured his default and satisfied the lien." *Id.* at 316, 859 A.2d at 263. Furthermore, the intermediate appellate court questioned a pro-se attorney's entitlement to "collect attorneys' fees for work on his own behalf" and opined that "at the end, Council's ultimate purpose in the proceeding was accomplished. [Mr.] Brooks won some major battles, but he ultimately lost the war that he occasioned by failing to pay his assessments in a timely fashion." *Id.* (alteration added). The intermediate appellate court affirmed the Circuit Court's judgments as they related to Mr. Brooks' questions, but, after examining the relevant governing documents and noting the budget allocation of an owner's assessment payments, ruled that the matter should be remanded for a recalculation of the interest due on the unpaid assessments, *i.e.,* "6% interest should be applied to that portion of the debt attributable to GCA assessments, and 18% interest to the portion attributable to Council assessments." *Id.* at 308–09, 859 A.2d at 258.

## II.  Discussion

The parties position themselves with two competing, yet nonparallel, theories of the issues before this Court. Council asserts that the Court of Special Appeals erred in affirming the Circuit Court's setting aside of the foreclosure sale on the

basis of an incorrect statement of the debt. On the other hand, Mr. Brooks contends that the Circuit Court's setting aside of the January 15, 1999, (second) foreclosure sale occurred because Council, by demanding such a high payoff amount, had effectively denied his right of redemption.

## A. Condominium Assessments

Despite the bevy of governing condominium documents present in this case, it is undisputed that Mr. Brooks, as owner of his condominium unit, was obligated to the payment of an annual assessment made due in monthly installments. *It is equally clear that on fifty or more occasions, spread over five or more years between 1989 and 1996, Mr. Brooks failed to pay such installments when due.* Condominium fees are designed to provide the condominium association and governing body with a stream of revenue to pay the expenses of the general common elements. As the Court of Special Appeals observed, "Assessments, however they may be characterized, are the financial life blood of common interest communities such as homeowners and condominium associations. They are the taxes on which those communities run and are essential to their operation." *Greenbriar Condominium,* 159 Md.App. at 316, 859 A.2d at 262–63.

## 1. The Maryland Condominium Act

The Maryland Condominium Act ("Act"), Md.Code (1974, 2003 Repl.Vol., 2004 Supp.), §§ 11–101 *et seq.* of the Real Property Article, not only provides the legislative framework for establishing a condominium regime, but also the authority by which a condominium development can maintain and sustain its existence through the collection of annual assessments upon the unit owners. Originally enacted by 1963 Md. Laws, Chap. 387, as the "Horizontal Property Act," Md.Code (1957, 1966 Repl.Vol.), Art. 21 §§ 116–142,[26] this Act established the

---

26. The Horizontal Property Act originally was designated as §§ 116–142 of the existing Article 21. The first two sections of this Act were later renumbered as § 117A and § 117B because Article 21 already contained a section numbered 116.

scope and duties of condominium development and ownership in Maryland. From the outset, this statute contained provisions allowing for the collection of assessments and the imposition of liens upon failure to pay:

"§ 131. **Common profits, contributions for payment of common expenses of administration and maintenance.**

(a) The common profits of the property shall be distributed among, and the common expenses shall be charged to, the unit owners according to the percentages established by Section 120 [Ownership of condominium units, of common elements] of this subtitle. [The allocation formulae have since been repealed or amended.]

(b) All co-owners shall contribute in accordance with the percentages [Again, the allocation formulae have changed.] toward the expenses of administration and of maintenance and repairs of the general common elements, and, in proper cases, of the limited common elements of the building and toward any other expenses lawfully agreed upon by the council of co-owners.

(c) No owner shall be exempt from contributing toward such common expenses by waiver of the use or enjoyment of the common elements, both general and limited, or by the abandonment of the condominium unit belonging to him.

(d) The contribution may be determined, levied and assessed as a lien on the beginning of each calendar or fiscal year, and may become and be due and payable in such instalments as the by-laws may provide, and the by-laws may further provide that upon default in the payment of any one or more of such instalments, the balance of said lien may be accelerated at the option of the manager, or board of directors and be declared due and payable in full." [Alterations added.]

When amended in 1972, the Horizontal Property Act was renumbered, but remained a part of the previous Maryland Code. *See* 1972 Md. Laws, Chap. 349, Title XI—Horizontal Property Act, §§ 11–101, *et seq.* The above-quoted section remained largely intact, undergoing only the Act-wide renum-

bering, and experiencing a slight alteration in its heading and some minor cosmetic changes:

"**§ 11–116.  Distribution of common profits; contributions toward common expenses.**

(a) The common profits of the property shall be distributed among, and the common expenses shall be charged to, the unit owners according to the percentages established by *11–105* [Ownership of condominium units; *undivided share interest in common elements* ] of this title.  [The allocation formulae have since been repealed or amended.]

(b) All co-owners shall contribute in accordance with the percentages [Again, the allocation formulae have since changed.] toward the expenses of administration and of maintenance and repairs of the general common elements, and, in proper cases, of the limited common elements of the building and toward any other expenses lawfully agreed upon by the council of co-owners.

(c) No owner shall be exempt from contributing toward such common expenses by waiver of the use or enjoyment of the common elements, both general and limited, or by the abandonment of the condominium unit belonging to him.

(d) The contribution may *pursuant to a provision in the by-laws,* be determined, levied and assessed as a lien on the beginning of each calendar or fiscal year, and may become and be due and payable in such installments as the bylaws may provide, and the bylaws may further provide that upon default in the payment of any one or more of such installments, the balance of said lien may be accelerated at the option of the manager, or board of directors and be declared due and payable in full." [Alterations added.]  [Changes emphasized.]

The only change affected to this section by 1973 Md. Laws, Chap. 2, § 2, was the addition of a section symbol (*i.e.,* § ) in § 11–116(a).

The next year, pursuant to 1974 Md. Laws, Chap. 12, the Maryland Horizontal Property Act was recodified as part of the Annotated Code of Maryland at Md.Code (1974), §§ 11–

101 *et seq.* of the Real Property Article. Later that year, 1974 Md. Laws, Chap. 641, resulted in renaming the statute as "The Maryland Condominium Act" ("Act"); the relevant section relating to condominium assessments was moved to § 11–110 and the language providing for the payment of condominium assessments was strengthened. The comments of the Condominium Revision Committee of the Real Property, Planning and Zoning Section of the Maryland State Bar Association reflect the importance of condominium assessments. In respect to the alterations from the then-denominated Horizontal Property Act, the Committee stated:

> "The new Title 11, however, goes well beyond the 1972 version to treat, or to substantially enlarge upon the earlier treatment of ... the establishment and enforcement of the lien for common expense assessments....

> . . .

> "The current Maryland [Horizontal Property Act] recognizes that the continuing viability of a condominium depends upon each unit owner contributing his fair share to the payment of common expenses; it provides a lien on the unit to enable the council of co-owners to collect assessments for such expenses." [Alteration added.]

The renumbered § 11–110 stated:

> "**§ 11–110. Common expenses and common profits.**

> (a) All common profits of the condominium shall be disbursed to the unit owners, be credited to their assessments for common expenses in proportion to their percentage interests in common profits and common expenses, or be used for any other purpose as the council of unit owners decides.

> (b) Funds for the payment of current common expenses and for the creation of reserves for the payment of future common expenses shall be obtained by assessments against the unit owners in proportion to their percentage interests in common expenses and common profits.

(c) A unit owner shall be liable for all assessments, or installments thereof, coming due while he is the owner of a unit. In a voluntary grant the grantee shall be jointly and severally liable with the grantor for all unpaid assessments against the grantor for his share of the common expenses up to the time of the voluntary grant for which a statement of condominium lien is recorded, without prejudice to the rights of the grantee to recover from the grantor the amounts paid by the grantee for such assessments. Liability for assessments may not be avoided by waiver of the use or enjoyment of any common element or by abandonment of the unit for which the assessments are made.

(d) All assessments, until paid, together with interest on them and actual costs of collection, constitute a lien on the units on which 'they are assessed, if a statement of lien is recorded within two years after the date the assessment becomes due. The lien shall be effective against a unit from and after the time a statement of condominium lien is recorded among the land records of the county where the unit is located, stating the description of the unit, the name of the record owner, the amount due and the period for which the assessment was due. The clerk shall index the statement of condominium lien under the name of the record owner in the grantor index and in the block index if one is maintained by the clerk. The statement of condominium lien shall be signed and verified by an officer or agent of the council of unit owners as specified in the by-laws and then may be recorded. On full payment of the assessment for which the lien is claimed the unit owner shall be entitled to a recordable satisfaction of the lien.

(e) Any assessment, or installment thereof, not paid when due shall bear interest, at the option of the council of unit owners, from the date when due until paid at the rate provided in the by-laws, not exceeding 8 percent per annum, and if no rate is provided, then at 8 percent per annum.

(f) The lien may be enforced and foreclosed by the council of unit owners, or any other person specified in the by-laws, in the same manner, and subject to the same requirements,

as the foreclosure of mortgages or deeds of trust on real property in the state containing a power of sale, or an assent to a decree. Suit for any deficiency following foreclosure may be maintained in the same proceeding and suit to recover a money judgment for unpaid assessments may be maintained without waiving the lien securing the same. No action may be brought to foreclose the lien unless brought within three years following the recordation of the statement of condominium lien. *No action may be brought to foreclose the lien except after ten days' written notice to unit owner given by registered mail—return receipt requested, to the address of the unit owner shown on the books of the council of unit owners. ..."* [Emphasis in original.]

In 1981 Md. Laws, Chap. 246, the purpose statement accompanying this amended legislation stated, in relevant part:

"FOR the purpose of specifying certain rights, duties, responsibilities and liabilities of lenders, unit owners, developers, and other persons and organizations having interests in condominiums; specifying powers and responsibilities of a condominium council of unit owners, and condominium board of directors; specifying certain conditions of sale of certain condominium units; specifying rights and duties of buyers and sellers of condominium units...."

The assessment payment language of § 11–110(d) and (e) was altered. These changes follow:

"**§ 11–110. Common expenses and common profits.**

(a) All common profits ~~of the condominium~~ shall be disbursed to the unit owners, be credited to their assessments for common expenses in proportion to their percentage interests in common profits and common expenses, or be used for any other purpose as the council of unit owners decides.

(b) Funds for the payment of current common expenses and for the creation of reserves for the payment of future common expenses shall be obtained by assessments against

the unit owners in proportion to their percentage interests in common expenses and common profits.

(c) A unit owner shall be liable for all assessments, or installments thereof, coming due while he is the owner of a unit. In a voluntary grant the grantee shall be jointly and severally liable with the grantor for all unpaid assessments against the grantor for his share of the common expenses up to the time of the voluntary grant for which a statement of condominium lien is recorded, without prejudice to the rights of the grantee to recover from the grantor the amounts paid by the grantee for such assessments. Liability for assessments may not be avoided by waiver of the use or enjoyment of any common element or by abandonment of the unit for which the assessments are made.

(d) All ANY assessments, until paid, together with interest, LATE CHARGES, IF ANY, on them and actual costs of collection, AND REASONABLE ATTORNEY'S FEES, constituteS a lien on the units on which IT IS they are assessed, if a statement of lien is recorded within two 2 years after the date the assessment becomes due. THE RECORDATION OF A GRANT OF A UNIT FOR VALUE EXTINGUISHES THE RIGHT OF THE COUNCIL OF UNIT OWNERS THEREAFTER TO FILE A STATEMENT OF CONDOMINIUM LIEN FOR ASSESSMENTS, OR INSTALLMENTS THEREOF, DUE PRIOR TO THE RECORDATION OF THE GRANT. The lien shall be effective against a unit from and after the time a statement of condominium lien is recorded among the land records of the county where the unit is located, stating the description of the unit, the name of the record owner, the amount due and the period for which the assessment was due. The clerk shall index the statement of condominium lien under the name of the record owner in the grantor index and in the block index if one is maintained by the clerk. The statement of condominium lien shall be signed and verified by an officer or agent of the council of unit owners as specified in the bylaws and then may be recorded. On full payment of the assessment AND OTHER PERMIT-

TED AMOUNTS for which the lien is claimed the unit owner shall be entitled to a recordable satisfaction of the lien IN ANY FORM USED FOR THE RELEASE OF MORTGAGES IN THE COUNTY IN WHICH THE CONDOMINIUM IS LOCATED. FEES, CHARGES, LATE CHARGES, FINES, AND INTEREST ESTABLISHED PURSUANT TO §§ 11–110(F) AND 11–112 [*i.e.*, Eminent domain] ARE ENFORCEABLE AS ASSESSMENTS UNDER THIS SECTION.

(e) Any assessment, or installment thereof, not paid when due shall bear interest, at the option of the council of unit owners, from the date when due until paid at the rate provided in the bylaws, not exceeding ~~8~~ 18 percent per annum, and if no rate is provided, then at ~~8~~ 18 percent per annum. THE BYLAWS ALSO MAY PROVIDE FOR A LATE CHARGE OF ~~two dollars~~ $15 OR ONE ~~twentieth~~ TENTH OF THE TOTAL AMOUNT OF ANY DELINQUENT ASSESSMENT OR INSTALLMENT, WHICHEVER IS GREATER, PROVIDED THE CHARGE MAY NOT BE IMPOSED MORE THAN ONCE FOR THE SAME DELINQUENT PAYMENT AND MAY ONLY BE IMPOSED IF THE DELINQUENCY HAS CONTINUED FOR AT LEAST 15 CALENDAR DAYS.

(f) The lien may be enforced and foreclosed by the council of unit owners, or any other person specified in the bylaws, in the same manner, and subject to the same requirements, as the foreclosure of mortgages or deeds of trust on real property in the state containing a power of sale, or an assent to a decree. Suit for any deficiency following foreclosure may be maintained in the same proceeding and suit to recover a money judgment for unpaid assessments may be maintained without waiving the lien securing the same. ~~No~~ AN action may NOT be brought to foreclose the lien unless brought within ~~three~~ 3 years following the recordation of the statement of condominium lien. ~~No~~ AN action may NOT be brought to foreclose the lien except after ~~ten~~ 10 days' written notice to unit owner given by registered mail—return receipt requested, to the address of the unit

owner shown on the books of the council of unit owners. . . ." [Allcaps and strikeouts indicate changes.] [Alteration added.]

The next year, 1982 Md. Laws, Chap. 836, primarily added and renumbered the subsections of § 11–110(e), specifically in respect to permitting acceleration of monthly assessments upon certain circumstances of a condominium unit owner's nonpayment:

"§ 11–110.

(d) Any assessment, until paid, together with interest, late charges, if any, and actual costs of collection, and reasonable attorney's fees, constitutes a lien on the unit on which it is assessed, if a statement of lien is recorded within 2 years after the date the assessment becomes due. The recordation of a grant of a unit for value extinguishes the right of the council of unit owners thereafter to file a statement of condominium lien for assessments, or installments thereof, due prior to the recordation of the grant. The lien shall be effective against a unit from and after the time a statement of condominium lien is recorded among the land records of the county where the unit is located, stating the description of the unit, the name of the record owner, the amount due and the period for which the assessment was due. The clerk shall index the statement of condominium lien under the name of the record owner in the grantor index and in the block index if one is maintained by the clerk. The statement of condominium lien shall be signed and verified by an officer or agent of the council of unit owners as specified in the bylaws and then may be recorded. On full payment of the assessment and other permitted amounts for which the lien is claimed the unit owner shall be entitled to a recordable satisfaction of the lien in any form used for the release of mortgages in the county in which the condominium is located. Fees, charges, late charges, fines, and interest established pursuant to §§ 11–110(f) and 11–112 FEES AND CHARGES IMPOSED UNDER § 11–109(D) AND FINES IMPOSED UNDER § 11–113 are enforceable as assessments under this section.

(e) (1) Any assessment, or installment thereof, not paid when due shall bear interest, at the option of the council of unit owners, from the date when due until paid at the rate provided in the bylaws, not exceeding 18 percent per annum, and if no rate is provided, then at 18 percent per annum.

(2) The bylaws also may provide for a late charge of $15 or one tenth of the total amount of any delinquent assessment or installment, whichever is greater, provided the charge may not be imposed more than once for the same delinquent payment and may only be imposed if the delinquency has continued for at least 15 calendar days.

(3) IF THE DECLARATION OR BYLAWS PROVIDE FOR AN ANNUAL ASSESSMENT PAYABLE IN MONTHLY INSTALLMENTS, THE DECLARATION OR BYLAWS MAY FURTHER PROVIDE THAT IF A UNIT OWNER FAILS TO PAY A MONTHLY INSTALLMENT WHEN DUE, THE COUNCIL OF UNIT OWNERS MAY DEMAND PAYMENT OF THE REMAINING ANNUAL ASSESSMENT COMING DUE WITHIN THAT FISCAL YEAR. A DEMAND BY THE COUNCIL IS NOT ENFORCEABLE UNLESS THE COUNCIL, WITHIN 15 DAYS OF A UNIT OWNER'S FAILURE TO PAY A MONTHLY INSTALLMENT, NOTIFIES THE UNIT OWNER THAT IF THE UNIT OWNER FAILS TO PAY THE MONTHLY INSTALLMENT WITHIN 15 DAYS OF THE NOTICE, FULL PAYMENT OF THE REMAINING ANNUAL ASSESSMENT WILL THEN BE DUE AND SHALL CONSTITUTE A LIEN ON THE UNIT AS PROVIDED IN THIS SECTION." [Allcaps and strikeouts indicate changes.] [Alterations added.]

The amendments of 1983 Md. Laws, Chap. 563, effected only a minor change which required that the notice of an action to foreclose which must be sent to the unit owner according to § 11–110(f) is to be sent by *certified* mail and must bear a postmark from the United States Postal Service. Similarly, the next year, in 1984 Md. Laws, Chaps. 255, there occurred no substantive change to the language of § 11–110.

Later that same year, 1984 Md. Laws, Chap. 525, allowed for the possibility that assessments may occur at other than monthly installments. Accordingly, § 11–110(e)(3) was amended to read as follows:

"(e) (3) If the declaration or bylaws provide for an annual assessment payable in ~~monthly~~ REGULAR installments, the declaration or bylaws may further provide that if a unit owner fails to pay ~~a monthly~~ AN installment when due, the council of unit owners may demand payment of the remaining annual assessment coming due within that fiscal year. A demand by the council is not enforceable unless the council, within 15 days of a unit owner's failure to pay ~~a monthly~~ AN installment, notifies the unit owner that if the unit owner fails to pay the monthly installment within 15 days of the notice, full payment of the remaining annual assessment will then be due and shall constitute a lien on the unit as provided in this section." [Allcaps and strike-outs indicate changes.]

1984 Md. Laws, Chap. 581, reenacted § 11–110(d), but with additional language that further refined the condominium lien process, and included a provision enabling a condominium unit owner to request a hearing before the Board of Directors prior to the lien's filing:

"§ 11–110.

(d) Any assessment, until paid, together with interest, late charges, if any, and actual costs of collection, and reasonable attorney's fees, constitutes a lien on the unit on which it is assessed, if a statement of lien is recorded within 2 years after the date the assessment becomes due. The recordation of a grant of a unit for value extinguishes the right of the council of unit owners thereafter to file a statement of condominium lien for assessments, or install-ments thereof, due prior to the recordation of the grant. The lien shall be effective against a unit from and after the time a statement of condominium lien is recorded among the land records of the county where the unit is located, stating the description of the unit, the name of the record owner, the amount due and the period for which the assessment

was due. The clerk shall index the statement of condominium lien under the name of the record owner in the grantor index and in the block index if one is maintained by the clerk. THE STATEMENT OF CONDOMINIUM LIEN SHALL STATE THAT WRITTEN NOTICE OF INTENTION TO FILE THE STATEMENT OF CONDOMINIUM LIEN, OF THE AMOUNT DUE, AND OF THE UNIT OWNER'S RIGHT TO REQUEST A HEARING PURSUANT TO THIS SECTION, WAS GIVEN TO THE OWNER OF THE UNIT AT THE ADDRESS SHOWN ON THE ROSTER MAINTAINED PURSUANT TO § 11-109(C)(2), BY OR ON BEHALF OF THE COUNCIL OF UNIT OWNERS, AT LEAST 15 DAYS IN ADVANCE OF RECORDING. The statement of condominium lien shall be signed and verified by an officer or agent of the council of unit owners as specified in the bylaws and then may be recorded. THE OWNER OF THE UNIT MAY, BEFORE RECORDING, OBTAIN A HEARING BEFORE THE BOARD OF DIRECTORS BY REQUESTING A HEARING IN WRITING WITHIN 15 DAYS AFTER NOTICE IS GIVEN, IF THE OWNER BELIEVES THAT THE AMOUNTS STATED IN THE WRITTEN NOTICE OR IN THE STATEMENT OF CONDOMINIUM LIEN ARE ERRONEOUS, OR ARE OTHERWISE NOT DUE AS CLAIMED. AFTER A HEARING, OR 15 DAYS AFTER NOTICE IS GIVEN IF NO HEARING IS REQUESTED, THE STATEMENT OF CONDOMINIUM LIEN MAY BE RECORDED. AFTER THE STATEMENT OF CONDOMINIUM LIEN IS RECORDED, THE OWNER OF THE UNIT MAY PETITION THE CIRCUIT COURT FOR THE COUNTY IN WHICH THE CONDOMINIUM IS LOCATED TO REFORM THE RECORDED STATEMENT OF CONDOMINIUM LIEN TO CORRECT ANY ERROR THERIN. On full payment of the assessment and other permitted amounts for which the lien is claimed the unit owner shall be entitled to a recordable satisfaction of the lien in any form used for the release of mortgages in the county in which the condominium is located. Fees and

charges imposed under § 11–109(d) and fines imposed under § 11–113 are enforceable as assessments under this section...."[27] [Allcaps and strikeouts indicate changes.] [Alteration added.]

In particular, the 1985 changes to the Maryland Condominium Act's assessments and lien subsection recognized the adverse effects on a condominium community of the failure of one or more unit owners to pay monthly assessments. A member of the Leisure World Community of Silver Spring, Maryland, who participated at the public hearings before the Maryland Senate Committee on Judicial Proceedings, conducted March 7, 1985, testified, "As a non-profit entity whose budget may be shared by persons of limited means, a condominium depends for its survival on prompt payment [of assessments] by all participants" (alteration added).

The first 1985 amendment, 1985 Md. Laws, Chap. 552, effective July 1, 1985, added two subsections to § 11–110(b), as follows:

"§ 11–110.

(b) (1) Funds for the payment of current common expenses and for the creation of reserves for the payment of future common expenses shall be obtained by assessments against the unit owner in proportion to their percentage interests in common expenses and common profits.

(2) (I) WHERE PROVIDED IN THE DECLARATION OR THE BYLAWS, CHARGES FOR UTILITY SERVICES MAY BE ASSESSED AND COLLECTED ON

---

27. There is no indication in the record that Mr. Brooks requested a hearing, or filed a complaint in the Circuit Court, in response to any of the "Notice[s] of Intent to File a Lien" sent to him. Mr. Brooks was apprised of his right to request a hearing by the following paragraph contained within the notices:

"Under Article 14–203 of the Maryland Contract Lien Act (MD CODE REAL PROPERTY), you have a right to a hearing to determine if probable cause exists to file this lien, provided you file a complaint in the Circuit Court for Prince George's County within 30 days of the date you receive this notice."

THE BASIS OF USAGE RATHER THAN ON THE BASIS OF PERCENTAGE INTERESTS.

(II)ASSESSMENTS FOR CHARGES UNDER SUBPARAGRAPH (I) OF THIS PARAGRAPH MAY BE ENFORCED IN THE SAME MANNER AS ASSESSMENTS FOR COMMON EXPENSES." [Allcaps indicate changes.]

Additionally, in 1985 Md. Laws, Chap. 736, also made effective July 1, 1985, § 11–110(d), was repealed and reenacted to coincide with the simultaneously and newly-enacted Maryland Contract Lien Act, Md.Code (1985), §§ 14–201, *et seq.* of the Real Property Article. According to its Bill Analysis, the Contract Lien Act was implemented specifically to "provide for the enforcement of condominium assessments by the imposition, enforcement and foreclosure of a lien on a condominium." This legislative action eliminated §§ 11–110(f) and (g) from the Maryland Condominium Act, and the new version of § 11–110(d), thus, provided:

"§ 11–110.

. . .

(D) PAYMENT OF ASSESSMENTS, TOGETHER WITH INTEREST, LATE CHARGES, IF ANY, COSTS OF COLLECTION AND REASONABLE ATTORNEY'S FEES MAY BE ENFORCED BY THE IMPOSITION OF A LIEN ON A UNIT IN ACCORDANCE WITH THE PROVISIONS OF THE MARYLAND CONTRACT LIEN ACT. SUIT FOR ANY DEFICIENCY FOLLOWING FORECLOSURE MAY BE MAINTAINED IN THE SAME PROCEEDING, AND SUIT TO RECOVER ANY MONEY JUDGMENT FOR UNPAID ASSESSMENTS MAY ALSO BE MAINTAINED IN THE SAME PROCEEDING, WITHOUT WAIVING THE RIGHT TO SEEK TO IMPOSE A LIEN UNDER THE MARYLAND CONTRACT LIEN ACT." [Allcaps indicate changes.]

The final change to § 11–110 occurred *via* 1986 Md. Laws, Chap. 359, which according to its purpose statement authorized, "under certain circumstances, assessments for mainte-

nance expenses of limited common elements to condominium unit owners *who are* given exclusive use of those elements." The changed language follows:

"§ 11–110.

(b) (1) Funds for the payment of current common expenses and for the creation of reserves for the payment of future common expenses shall be obtained by assessments against the unit owner in proportion to their percentage interests in common expenses and common profits.

(2) (i) Where provided in the declaration or the bylaws, charges for utility services may be assessed and collected on the basis of usage rather than on the basis of percentage interests.

(II) IF ~~PERMITTED~~ PROVIDED BY THE DECLARATION ~~OR BYLAWS~~, ASSESSMENTS FOR EXPENSES RELATED TO MAINTENANCE OF THE ~~CONDOMINIUM~~ LIMITED COMMON ELEMENTS MAY BE CHARGED TO THE UNIT OWNER OR OWNERS WHO ARE GIVEN THE EXCLUSIVE RIGHT TO USE THE LIMITED COMMON ELEMENTS.

~~(ii)~~ (III) Assessments for charges under ~~subparagraph (i) of~~ this paragraph may be enforced in the same manner as assessments for common expenses." [Allcaps indicate changes.]

## 2. Maryland Contract Lien Act

The Maryland Contract Lien Act, Md.Code (1985, 2003 Repl.Vol.), §§ 14–201 *et seq.* of the Real Property Article, permits the creation of a lien by contract. Its stated legislative intent, found in the Summary of Committee Report, is "to attempt to give condominiums, homeowners associations, business parks, and similar entities an enforceable means of collecting assessments from delinquent unit owners or members." The lien provisions of the Maryland Contract Lien Act were upheld in *Golden Sands Club Condominium, Inc. v. Waller,* 313 Md. 484, 545 A.2d 1332 (1988):

"The Maryland Contract Lien Act is codified as Title 14, Subtitle 2 of the Real Property Article. It was enacted by Ch. 736, Acts of 1985. It includes procedures for establishing and enforcing a lien against a condominium unit when certain assessments and other costs chargeable against the unit have not been paid. We shall here hold that those procedures, so far as they relate to requirements of notice to the unit owner and that owner's entitlement to a hearing, afford the due process of law demanded by the United States and Maryland Constitutions."

*Golden Sands,* 313 Md. at 486, 545 A.2d at 1333. As to the enforcement of liens, the Maryland Contract Lien Act, provides as follows:

"§ 14–204. **Enforcement and foreclosure of lien.**

(a) *Manner of enforcement and foreclosure.*—A lien may be enforced and foreclosed by the party who obtained the lien in the same manner, and subject to the same requirements, as the foreclosure of mortgages or deeds of trust on property in this State containing a power of sale or an assent to a decree.

(b) *Suits for deficiency and unpaid damages.*—If the owner of property subject to a lien is personally liable for alleged damages, suit for any deficiency following foreclosure may be maintained in the same proceeding, and suit for a monetary judgment for unpaid damages may be maintained without waiving any lien securing the same.

(c) *Time limit.*—Any action to foreclose a lien shall be brought within 3 years following recordation of the statement of lien."

The liens against Mr. Brooks' condominium unit were filed pursuant to the provisions of the Maryland Contract Lien Act, which works hand-in-hand with § 11–110 of the Maryland Condominium Act, which, as we have amply demonstrated, evolved to support the maintenance needs of condominium developments as achieved through annual assessments on the condominium unit owners.

### B. Creditor's Statement of Debt Owed

Council asserts that Maryland case law holds "that an incorrect statement of debt does not constitute grounds for enjoining or setting aside a foreclosure sale" and directs us to *Maryland Permanent Land & Building Society of Baltimore v. Smith*, 41 Md. 516 (1875), in which this Court held that an auctioneer's announcement requiring a cash deposit that was not stated in the decree did not constitute such a departure from the decree's terms so as to be fatal to the foreclosure sale's ratification. In *Maryland Permanent*, the Court found no evidence that the required deposit payment of $300, as described in this 1875 case, was unreasonable or that it deterred or prevented anyone from bidding at the judicial sale. *Id.* at 521. As especially relevant to the case at bar, we further held in *Maryland Permanent* as follows:

> "As to the other exceptions, which rest upon objections to the right of the trustee to sell the property, we agree with the judge of the Circuit Court . . . that 'they are not tenable.'
>
> "If the statement [of mortgage claim] is erroneous in not showing the true balance due upon the mortgage, it is open to correction, when the account may be stated by the auditor; but furnishes no reason for setting aside the sale.
>
> "The same may be said of the objection that the terms of the mortgage are usurious, that question can only arise upon the statement of the final account by the auditor, and cannot be urged as an objection to the sale."

*Id.* at 521–22.

■ *Maryland Permanent* was cited as authority in *Boynton v. Remson*, 133 Md. 101, 104 A. 527 (1918). " '[T]he question of usury "can only arise upon the statement of the final account by the auditor, and cannot be urged as an objection to the sale. . . ." ' " *Boynton*, 133 Md. at 106, 104 A. at 528. *See also Kirsner v. Sun Mortgage Co.*, 154 Md. 682, 688, 141 A. 398, 400 (1928), which stated:

> "This court has held that the usurious character of a mortgage is no ground for setting aside a mortgage foreclo-

sure sale, and stated that the question of usury should be determined at the time of the audit. . . . [T]he proper method and time to raise the question of usury in respect to a mortgage which had been foreclosed was by filing exceptions to the ratification of the auditor's report."

■ In *Pacific Mortgage & Inv. Group, Ltd. v. LaGuerre*, 81 Md.App. 28, 566 A.2d 780 (1989), the Court of Special Appeals reiterated the *Maryland Permanent* holding and stated:

"It is unnecessary for us to determine whether the $1,382 interest calculation is correct. . . . [T]hat error would not constitute grounds for enjoining or setting aside the foreclosure sale. . . .

Accordingly, it was clear error for the trial judge to find, at that early stage of this case [*i.e.*, sale ratification], that the statement of mortgage debt was incorrect."

*Pacific Mortgage*, 81 Md.App. at 33–34, 566 A.2d at 783 (alterations added). In this vein, Council argues:

"Even if the statement of debt is found to be inaccurate, there was no prejudice sustained by Brooks because the Council did not interfere with his right to redeem the property. He had at his disposal the ability to stop the January 15, 1999 foreclosure sale by seeking injunctive relief. Maryland Rule 14–209(b) establishes a procedure to allow disputes over the debt amount to be resolved without the sale of the mortgagor's property. To the extent that Brooks might allege other prejudice from this statement of debt, he was required to identify this prejudice in his exceptions. [*See* ] Maryland Rule 14–305(d)(1). His failure to do so constitutes a waiver of such arguments." [Alteration added.]

Council does not specify *which* statement of debt it believes to be inaccurate—the $31,114.64, or the auditor's amended amount of $5,445.89, but maintains that determination of the precise debt is a matter reserved for the post-sale audit process. Council is correct. The precise indebtedness figure is to be adjudicated after the ratification of the sale itself, by the

Circuit Court following receipt of the auditor's statement of account. Under Maryland law, the audit follows ratification; it does not precede it.

■ In *Schaller v. Castle Devel. Corp.*, 347 Md. 90, 698 A.2d 1106 (1997) (finding unnecessary a prohibition on post-sale upward adjustment of the principal balance because such a prohibition would alter the priority of the lien holders and an understated mortgage was unlikely to provide advantage to the lender), Judge Rodowsky described several cases arising under an 1833 statute which had required the trustees conducting the foreclosure sale to file, after the decree of sale but before the sale itself, an affidavit stating the amount of remaining mortgage debt. *Id.* at 96, 698 A.2d at 1109. *See, e.g., Schaefer v. Amicable Permanent Land & Loan Co.*, 47 Md. 126, 128 (1877) (stating "[t]he account filed by the mortgagee, purporting to show the sum due, is not conclusive upon the mortgagor, and in case the property should be sold, it will be open to her to contest it, and to have the amount actually due according to law ascertained and determined"). The *Schaller* holding, as well as *Schaefer, Maryland Permanent, Boynton, Kirsner,* and *Pacific Mortgage,* support the proposition that a later-altered statement of debt generally causes the debtor no prejudice because, in most circumstances, including the present, the debtor has additional means by way of exceptions to the audit with which to redress his contention that the creditor's proffered indebtedness statement is incorrect.

### C. Debtor's Right of Redemption

■ Mr. Brooks hinges his argument on his belief that Council's statement of indebtedness was not simply *incorrect,* but was more along the lines of *inconceivable* and evidence of bad faith,[28] should Mr. Brooks, realistically, have been able to exercise his right to redeem his property.

---

**28.** Mr. Brooks has defaulted at least fifty times, and perhaps more than ninety times, in the payment of installments of his condominium assess-

The right of redemption, also known as the equity of redemption, is an equity-based principle. As this Court explained in *Simard v. White*, 383 Md. 257, 859 A.2d 168 (2004):

> "The 'equity of redemption' as applied to present lien instrument transactions, is the right to reacquire clear title to property mortgaged to secure a debt, upon repayment of that debt. It, in essence, upon proper payment of the mortgage debt, divests the mortgaged premises of the lien created by the mortgage. The right to redeem, even in a mortgage context, can be itself divested by a valid mortgage foreclosure sale, or by a waiver made subsequent to, and outside the mortgage instrument itself."

*Id.* at 272 n. 12, 859 A.2d at 177 n. 12.

Citing to our earlier cases of *Union Trust Co. v. Biggs*, 153 Md. 50, 137 A. 509 (1927) and *Berry v. Skinner*, 30 Md. 567 (1869), this Court in *Butler v. Daum*, 245 Md. 447, 226 A.2d 261 (1967), explained:

> "The final claim of the appellants that they had a right to redeem the property at any time prior to the ratification of the sale is also without merit inasmuch as the right of redemption was divested by the valid foreclosure sale. Although the jurisdiction of equity does not become complete until the filing of the report of sale, *nevertheless the sale in effect foreclosed the mortgage and divested the mortgagors of all right of redemption*, and unless satisfactory proof is shown before final ratification that the sale should be set aside, which was not done in this case, all rights of the mortgagors in the land are deemed to have ceased to exist as of the date of the sale."

*Butler*, 245 Md. at 453, 226 A.2d at 264 (citations omitted) (emphasis added). Thus, according both to our case law and to Council, once the property was sold on the morning of January 15, 1999, Mr. Brooks' right of redemption terminated.

---

ments. Conceivably, bad faith may be present in this case. The question, however, is whose bad faith?

Mr. Brooks' argument that Council somehow deprived him of his right of redemption, moreover, is without merit. The creditor does not control the right of redemption; the debtor either chooses or fails to exercise it. We observe that, at no time, did Mr. Brooks tender the complete amount under any of the calculations—including interest and appropriate collection costs—of the debt that was due. Furthermore, according to the relevant provision of the Maryland Contract Lien Act, the lien holder is not required to release the lien until the specified interest and other proper charges are paid. Md. Code (1974, 2003 Repl.Vol.), § 14–203(k) of the Real Property Article allows for release of the lien upon payment of the ordered costs or payment of the specified lien amount:

"§ 14–203. Creation of lien as result of breach of contract.

. . .

(k) *Releasing lien.*—If an order is entered under subsection (i) of this section [*i.e.,* costs] denying a lien, or if a bond is filed under subsection (h) of this section [*i.e.,* removal of lien upon filing bond], the clerk of the circuit court shall enter a notation in the land records releasing the lien." [Alterations added.]

Exercise of the right of redemption by satisfying the entire outstanding lien debt is not the sole means by which to halt the foreclosure sale. Our Rules provide broader protections. Upon Council's rejection of his check for $3,411.00, which would have satisfied the existing recorded liens though not the accruing interest on those liens, Mr. Brooks was not left without recourse. Instead, he sat on his rights until the very last moment at which time his strategy did not go according to plan. As Mr. Brooks has amply demonstrated, he is magnificently capable of making voluminous filings. He should have filed an injunction *prior* to the foreclosure sale in order to seek to halt the sale.

### D. Challenge Prior to Foreclosure Sale

■ Mr. Brooks argues that his good faith tender of the check for $3,411.00 on December 10, 1998, despite Council's rejection the very next day, coupled with his December 21, 1998, request for the balance due, was an effective tender to satisfy the existing liens and should have precluded the January 15, 1999, foreclosure sale. He cites to *Kent Bldg. & Loan Co. v. Middleton*, 112 Md. 10, 17, 75 A. 967 (1910), which stated, "As a mortgagee has no right to make the sale after a lawful tender of the amount due, the sale, when made, may be excepted to by the party authorized to redeem the mortgage and who made the tender."

■ Mr. Brooks effectively is asserting an argument that seeks to have this Court approve his "substantial compliance" rather than "complete compliance" in paying the lien debt and proper charges. Foreclosure proceedings which seek enforcement of a lien, however, rarely resolve upon the debtor's substantial compliance, lest the very genesis of foreclosure proceedings be stilted or stifled. It is the debtor's failure of strict and complete compliance that prompts most liens and later, foreclosure proceedings. Thus, substantial compliance in tendering a payment to satisfy the outstanding debt is insufficient once the decree of foreclosure has been declared. The debtor's next recourse, however, is found in Maryland Rule 14–209, which provides:

"**Rule 14–209. Release and assignment—Stay—Insolvency.**

. . .

(b) **Injunction to Stay Foreclosure.** (1) Motion. The debtor, any party to the lien instrument, or any person who claims under the debtor a right to or interest in the property that is subordinate to the lien being foreclosed, *may* file a motion for an injunction to stay any sale or any proceedings after a sale under these rules.[29] The motion

---

29. Mr. Brooks filed an "Emergency Motion for Appropriate Relief (for TRO and stay of further proceedings with respect to 1/15/99 foreclosure

shall not be granted unless the motion is supported by affidavit as to all facts asserted and contains: (1) a statement as to whether the moving party admits any amount of the debt to be due and payable as of the date the motion is filed, (2) if an amount is admitted, a statement that the moving party has paid the amount into court with the filing of the motion, and (3) a detailed statement of facts, showing that: (A) the debt and all interest due thereon have been fully paid, or (B) there is no default, or (C) fraud was used by the secured party, or with the secured party's knowledge, in obtaining the lien." [Emphasis added.] [Footnote added.]

The Court of Special Appeals correctly observed that Mr. Brooks did not file a timely motion to enjoin the January 15, 1999, foreclosure sale. That court, however, also noted that the Circuit Court did not find that his failure to file prior to the sale warranted the foreclosure sale's annulment and rather the Circuit Court, "invalidated the sale on the basis of the exceptions to the foreclosure sale that Brooks filed." *Greenbriar Condominium*, 159 Md.App. at 292, 859 A.2d at 249. Namely, the Circuit Court determined that Mr. Brooks' tender of a check for $3,411.00, matched the amounts of the filed liens for 1995 and 1996, notwithstanding any interest. Moreover, the Circuit Court perceived that Mr. Brooks' later, post-foreclosure sale, additional check for interest in an amount ranging from $74.30 to $162.89, addressed the issue of interest that was due on the liens,[30] and disposed of the matter.

---

sale; for preliminary injunction; and to set aside said 1/15/99 foreclosure sale)" on January 19, 1999. The Circuit Court heard this motion on January 28, 1999, and, in response, ordered the parties to submit a suggested statement account. Presumably, this was a denial of Mr. Brooks' "Emergency Motion for Appropriate Relief."

In order to enjoin a sale pursuant to Md. Rule 14–209(b), the injunction must be filed *prior* to the foreclosure sale. If filed *after* the foreclosure sale, the injunction is in respect only to subsequent proceedings.

**30.** In giving its approval to Mr. Brooks' submission of a check for the interest on the liens, it can be concluded that the Circuit Court affirmed

Mr. Brooks argues the permissive nature of Maryland Rule 14–209 regarding the filing of a motion to enjoin a pending foreclosure sale in support of his failure to file a motion to enjoin *prior* to the January 1999 foreclosure sale.[31] Mr. Brooks goes on to state in a footnote:

"Council's brief ... appears to assert that the clearly permissive provisions of Rule 14–209(b) are mandatory, and that Brooks somehow was precluded from filing exceptions after the sale because he was restricted to filing an injunction before the sale. There is absolutely no authority for this proposition, which inexplicably ignores the provisions of Md. Rule 14–305(d) [Procedure following judicial sale, exceptions] and longstanding case law in Maryland permitting the filing of exceptions to foreclosure sales. Brooks is not aware of anything in the law that would preclude a debtor from proceeding under either or even both Rules." [Alterations added.]

Mr. Brooks also cites *Chesapeake Bay Distributing Co. v. Buck Distributing Co., Inc.,* 60 Md.App. 210, 214, 481 A.2d 1156, 1158 (1984) (citing 15 Williston, *A Treatise on the Law of Contracts* § 1819 (3d ed.1972)) for the proposition that "[a] tender is excused where the obligee has manifested to the obligor that tender, if made, will not be accepted, or that a tender would be at most merely a futile gesture." In *Chesapeake,* the losing party's attempted delivery of a check for the amount of the judgment, which Chesapeake, the intended payee, perceived as an effort to resolve the matter before an appeal of the judgment award could be taken, was rejected by

---

that there was, indeed, some level of interest that had accumulated on the lien amounts.

**31.** Mr. Brooks' argument, however, is of the "shut the barn door after the horse escapes" variety. He *intended* to be present at the Prince George's County Courthouse at 8:45 a.m. on January 15, 1999, *i.e., prior* to the commencement of the foreclosure sale scheduled for 9:30 a.m., but did not reach the courthouse at his intended hour. Whatever Mr. Brooks' reasons for attempting to enjoin the foreclosure sale by the narrowest of margins, his argument as to the permissive nature of filing a motion to enjoin the sale is inconsistent with his January 15, 1999, intended course of action.

the Chesapeake who then appealed, but lost. *Id.* at 210, 481 A.2d at 1157–58. The intermediate appellate court determined that Chesapeake's refusal of the check did not "amount[ ] to a pre-tender rejection so as to excuse actual production of money and toll the accumulation of interest," *id.* at 215, 481 A.2d at 1159, but rather Buck's tender was clearly conditioned on terminating the case and, in rejecting the tender, Chesapeake's attorney was apprising opposing counsel of the case's status. *Id.* at 215, 481 A.2d at 1159.

■ As Council noted, Mr. Brooks suffered no prejudice from his inability to make payment of Council's claimed $31,114.64, even if incorrect, because Mr. Brooks still had the ability to seek injunctive relief or to take exceptions to the audit. "[A]ppellate courts of this State will not reverse a lower court judgment for harmless error: the complaining party must show *prejudice* as well as *error.*" *Harris v. David S. Harris, P.A.,* 310 Md. 310, 319, 529 A.2d 356, 360 (1987). When Council rejected Mr. Brooks' tender, which did not include interest and other proper charges, injury to Mr. Brooks was not a foregone conclusion. His obligation, however, was to prosecute his rights, not to sit on them. In fact, Council's submission of a figure exceeding thirty-thousand dollars would seem to be a signal to Mr. Brooks of a considerable disagreement as to the indebtedness amount, and would serve as further motivation for his moving to enjoin the foreclosure sale.

■ We believe the lower courts overlooked an instructive opportunity when they declined to emphasize the pre-foreclosure sale procedures. Generally, injunctions are to be filed prior to the action which they seek to forestall. The timing of this remedy is not elective. Were a post-sale injunction retroactively overturning a sale permitted, such a remedy would not only be counter to the logic and nature of injunctions, but would give rise to conflicts among the interested parties. The debtor might seek another bite at the apple, or some other junior lien holder might enjoin only if the sale fetched a price insufficient to satisfy his debt.

The equities cannot be maintained—and are not intended to be maintained—*after* the foreclosure sale by any method other than the filing of exceptions. The nature of the exceptions may be to request that the Circuit Court take action relative to an audit that has been duly stated or even to set aside the sale due to irregularities in the sale process itself—but not to upset retroactively a sale properly held. Challenges, by means of filing exceptions to the foreclosure sale are generally promulgated in two manners after the sale: first, exceptions filed prior to the Circuit Court's ratification of the sale generally assert procedural irregularities in the sale itself. These might include allegations such as the advertisement of sale was insufficient or misdescribed the property, the creditor committed a fraud by preventing someone from bidding or by chilling the bidding, challenging the price as unconscionable, etc. Alternatively, or in addition, challenges to the creditor's exact statement of debt are generally submitted by filing exceptions to the post-ratification auditor's report. Generally, the auditor has no role to play in the ratification of the sale.

Maryland Rule 14–305 provides the procedure for filing exceptions following the foreclosure sale and prior to the sale's ratification:

"**Rule 14–305. Procedure following sale.**

. . .

(d) **Exceptions to sale.** (1) How taken. A party, and, in an action to foreclose a lien, the holder of a subordinate interest in the property subject to the lien, may file exceptions to the sale. Exceptions shall be in writing, shall set forth the alleged irregularity with particularity, and shall be filed within 30 days after the date of a notice issued pursuant to section (c) of this Rule or the filing of the report of sale if no notice is issued. Any matter not specifically set forth in the exceptions is waived unless the court finds that justice requires otherwise.

(2) Ruling on exceptions; hearing. The court shall determine whether to hold a hearing on the exceptions but it may

not set aside a sale without a hearing. The court shall hold a hearing if a hearing is requested and the exceptions or any response clearly show a need to take evidence. The clerk shall send a notice of the hearing to all parties and, in an action to foreclose a lien, to all persons to whom notice of the sale was given pursuant to Rule 14–206(b) [*i.e.*, Procedure prior to the sale—Notice]." [Alteration added.]

■ The party putting forth the exceptions to the sale must prove the substance of his contentions in respect to the irregularity in the manner in which the sale was held. "The invalidity of a mortgage sale, like other judicial sales, is not presumed, and the burden of proving the contrary is on the one attacking the sale." *Butler*, 245 Md. at 453, 226 A.2d at 264. Determination of the precise amount of the debt, however, is reserved to examination of the auditor's account. It is unnecessary—and incorrect—for the trial judge to rule upon the propriety of the debt amount prior to the audit or to depend upon the audit as a prerequisite to a consideration of the ratification of the sale. The correct procedure is that the ratification of the sale itself is first considered and if the sale was not procedurally irregular and the price is not unconscionable, it is ratified. Then, and only then, is the case *first* referred to the auditor for an audit. Exceptions to the audit may then be taken. *See Pacific Mortgage*, 81 Md.App. at 34, 566 A.2d at 783 (holding that it was error for the court to rule that the statement of mortgage debt was incorrect prior to submission of the auditor's statement of account). According to Maryland Rule 2–543, the foreclosure sale, once ratified, must then be referred to a court auditor to state an account. The auditor may hold hearings and call witnesses prior to making the statement of account. Maryland Rule 2–543 states, in relevant part, as follows:

"**Rule 2–543.  Auditors.**

. . .

(b) **Referral by order.** In addition to referrals required by rule or statute, the court, on motion of any party or on its own initiative, may refer by order to an auditor an action

founded on an account or an action in which it is necessary to examine, state, or settle accounts. When a matter is referred to an auditor, the order shall state the purpose and scope of the audit. The order may prescribe the manner in which the audit is to be conducted and shall set time limits for the completion of the audit and the rendering of the account or report.

(c) **Powers.** The auditor may require any party to submit a proposed account and supporting vouchers. Subject to the provisions of the order of reference, an auditor has the power to regulate all proceedings in the hearing, including the powers to:

(1) Direct the issuance of a subpoena to compel the attendance of witnesses and the production of documents or other tangible things;

(2) Administer oaths to witnesses;

(3) Rule upon the admissibility of evidence;

(4) Examine witnesses;

(5) Convene, continue, and adjourn hearings, as required;

(6) Recommend contempt proceedings or other sanctions to the court; and

(7) Make findings of fact and conclusions of law.

(d) **Hearing.** (1) Notice. If a hearing is necessary, the auditor shall fix the time and place for the hearing and shall send written notice to all parties and to all persons who have filed a claim in the proceedings at the address stated in the claim.

(2) Attendance of witnesses. A party or claimant may procure by subpoena the attendance of witnesses and the production of documents or other tangible things at the hearing.

(3) Record. All proceedings before an auditor shall be recorded either stenographically or by an electronic recording device, unless the making of a record is waived in writing by all parties and claimants. A waiver of the making of a record is also a waiver of the right to file any

exceptions that would require review of the record for their determination.

.(e) **Account or report.** Within the time prescribed by the order of reference, the auditor shall file an account or report and at the same time send a copy to each party. The original exhibits shall also be filed. On the date of filing, the auditor shall send to each party and claimant a notice stating that the account or report was filed on that date; that any exceptions shall be filed within ten days of that date; and that, if timely exceptions are not filed, the account or report may be ratified. The notice to a claimant shall also specify the amount allowed to that claimant in the account or report. If a partial or total distribution of the estate of a debtor by a receiver or assignee is involved, the notice shall comply with the requirements of Rule 13–502(c) [Receivers and Assignees—Notice by auditor]. The auditor shall certify to the court that the requirements of this section have been met." [Alteration added.]

If aggrieved by the auditor's statement of account, the parties may file another round of exceptions—this time to the auditor's report. Rule 2–543(g) and (h) provide:

"(g) **Exceptions.** (1) How taken. Within ten days after the filing of the auditor's account or report, a party or claimant may file exceptions with the clerk. Within that period or within three days after service of the first exceptions, whichever is later, any other party or claimant may file exceptions. Exceptions shall be in writing and shall set forth the asserted error with particularity. Any matter not specifically set forth in the exceptions is waived unless the court finds that justice requires otherwise.

(2) Transcript. A party or claimant who has filed exceptions shall cause to be prepared and transmitted to the court a transcript of so much of the testimony [of the hearing conducted by the auditor] as is necessary to rule on the exceptions.... Instead of a transcript, the parties and claimants whose interest could be affected by the exceptions may agree to a statement of facts or the court by order may accept an electronic recording of the proceedings as the

transcript. The court may dismiss the exceptions of a party or person who has not complied with this section.

(h) **Hearing on exceptions.** The court may decide exceptions without a hearing unless a hearing is requested with the exceptions or by an opposing party or claimant within five days after service of the exceptions. The exceptions shall be decided on the evidence presented to the auditor unless: (1) the excepting party or claimant sets forth with particularity the additional evidence to be offered and the reasons why the evidence was not offered before the auditor; and (2) the court determines that the additional evidence should be considered. If additional evidence is to be considered, the court may remand the matter to the auditor to hear the additional evidence and to make appropriate findings or conclusions or the court may hear and consider the additional evidence." [Alteration added.]

In approving the Circuit Court's action, according to Council, the Court of Special Appeals further confused the foreclosure sale process, because its decision would require an evidentiary hearing—at the post-sale ratification stage—in order to determine whether the debtor's tender was in good faith, whether the creditor made an excessive claim of debt, or even whether further attempts at payment were rendered meaningless by an excessive statement of indebtedness. Such matters normally are properly addressed by pre-sale requests for injunctive relief. Moreover, calculation of the precise amount of the debt, which customarily is reserved to the audit at the completion of the foreclosure sale, would be inappropriately injected into the hearings on the exceptions to the sale. As we have indicated, however, the foreclosure sale's continuing to proceed does not hinge on the creditor's statement of indebtedness.

The Circuit Court was persuaded of Mr. Brooks' argument that his attempted tender of the amount of the recorded liens was sufficient and should have prevented the foreclosure sale. We are not so persuaded that his attempt at tender was sufficient to have halted the sale and we hold that, after Mr. Brooks' tender was rejected, he should have filed to enjoin the

foreclosure sale, as he had ample time to do. Under the circumstances here present, the sale should not have been overturned at the ratification stage based on the creditor's rejection of the debtor's attempt at redemption. Under these circumstances, that was an issue for pre-sale injunctive relief.

## III. Conclusion

The Maryland Condominium Act, Md.Code (Md.Code 1974, 2003 Repl.Vol.), § 11–110 of the Real Property Article, enables a condominium council of unit owners to require the payment of annual assessments from unit owners and the Maryland Contract Lien Act, Md.Code (1985, 2003 Repl.Vol.), §§ 14–201 *et seq.* of the Real Property Article, provides the procedure for the filing of liens against a condominium owner's unit when an owner does not pay those assessments.

We hold that a debtor who seeks to forestall a foreclosure sale by redemption must either proffer to pay the stated outstanding debt, or must file a motion to enjoin the sale, on issues relating to tender, prior to the sale's occurrence. When a dispute over the sum due exists, although it is conceded that some sum is due and in default, the proper procedure to stay or stop the sale itself on issues relating to tender and redemption, is a motion seeking to enjoin the sale prior to the sale. After the sale, redemption is foreclosed and the issues over sums due, or not due, are addressed at the audit stage, not the ratification stage. A debtor may challenge irregularities in the foreclosure sale's procedure by filing post-sale exceptions at the time of ratification and seek to overturn the sale on those bases. Likewise, a debtor may challenge the statement of indebtedness as to amounts by filing exceptions to the auditor's statement of account.

A creditor's refusal to accept a debtor's good faith, but insufficient, tender or a debtor's proffer of an incorrect amount does not insulate a debtor's right of redemption from the sale because injunctive relief *via* Maryland Rule 14–209 is the proper means available to a debtor prior to a foreclosure

sale to bring such issues to the attention of the Circuit Court. The foreclosure sale extinguishes the right of redemption. **JUDGMENT OF THE COURT OF SPECIAL APPEALS AS TO PETITIONER GREENBRIAR'S APPEAL IS REVERSED. JUDGMENT OF THE COURT OF SPECIAL APPEALS OTHERWISE AFFIRMED. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT WITH DIRECTIONS TO THE CIRCUIT COURT TO RATIFY THE SALE THAT IS THE SUBJECT OF THESE PROCEEDINGS. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT, BROOKS.**

BELL, C.J. and ELDRIDGE, J. dissent for the reasons stated in the opinion of the Court of Special Appeals.